43 A.3d 397

**MRA PROPERTY MANAGEMENT, INC., et al.**

v.

**Susan ARMSTRONG, et al.**

**No. 93, Sept. Term, 2007.**

Court of Appeals of Maryland.

April 30, 2012.

Robert L. Ferguson, Jr. (Michele Z. Blumenfeld and Bernard A. Meis of Ferguson, Schetelich & Ballew, P.A., Baltimore, MD), argued April 4, 2008 on brief, for Appellants/Cross–Appellees.

Steven E. Leder (Thomas W. Hale of Leder Law Group, LLC, Baltimore, MD), argued April 4, 2008 on brief, for Appellants/Cross–Appellees.

Robert L. Ferguson, Jr. (Michele Z. Blumenfeld and Bernhard A. Meis of Ferguson, Schetelich & Ballew, P.A. of Baltimore, MD; Steven E. Leder and Thomas W. Hale of Leder Law Group, LLC of Baltimore, MD), reargued March 1, 2012 on brief for appellants/cross-appellees.

Stacie F. Dubnow (David Freishtat and William Michael Mullen of Freishtat, Mullen & Dubnow, LLC, Hunt Valley, MD), argued April 4, 2008 on brief, for Appellees/Cross–Appellants.

David Freishtat (William Michael Mullen and Stacie F. Dubnow of Freishtat, Mullen Dubnow, LLC of Hunt Valley, MD) reargued March 1, 2012 on brief for appellees/cross-appellants.

Argued April 4, 2008 before BELL, C.J., HARRELL, BATTAGLIA, GREENE, MURPHY,* JOHN C. ELDRIDGE (Retired, specially assigned) and DALE R. CATHELL (Retired, specially assigned), JJ.

Reargued March 1 2012 before BELL, C.J., HARRELL, BATTAGLIA, GREENE, McDONALD, JOHN C. ELDRIDGE (Retired, specially assigned) and DALE R. CATHELL (Retired, specially assigned), JJ.

BATTAGLIA, J.

This case involves a long-standing dispute between the Tomes Landing Condominium Association, Inc. (Association),

---

* Murphy, J., now retired, participated in the hearing and conference of this case while an active member of this Court but did not participate in the rehearing and conference of this case or the decision and adoption of this opinion.

located in Port Deposit, Maryland, and MRA Property Management, Inc., Appellants, and twenty-five condominium unit purchasers, Appellees.[1] The unit purchasers were granted partial summary judgment in the amount of one million dollars against the Association and MRA in the Circuit Court for Cecil County, on the ground that the operating budget that MRA and the Association supplied as part of a "resale package" provided to the unit purchasers violated Sections 13–301(1), 13–301(3), and 13–303 of the Maryland Consumer Protection Act,[2] because the budgets "had the capacity, ten-

---

1. The individual unit owners named as plaintiffs in the second amended complaint were: Susan Armstrong, Lois Ashworth, Reda Beer (Trustee), Pat Boling, Donald and Wendy Claus, Mary Anne Conover, Donald Gomish, Karen Green and Arthur Kettell, Karen and Robert Halupke, Ellen Jones, Kenneth Ko, Kenneth and Rita Kraft, Lynn Lehnert and Michael Owens, Theresa Lina, Ruth Maciejeski, Michael McGinn, Scott and Heather Mueller, MSM Investments, LLC, Eta Roehm, Roy and Diane Schaefer, John and Judy Schlecht, John and Dinah Schlecht, Michael and Jana Siwek, Thomas Stalcup, and David Sugar.

2. Section 13–301 states, in pertinent part:

 13–301. Unfair or deceptive trade practices defined:
 Unfair or deceptive trade practices include any:
 (1) False, falsely disparaging, or misleading oral or written statement, visual description, or other representation of any kind which has the capacity, tendency, or effect of deceiving or misleading consumers;

 \* \* \*

 (3) Failure to state a material fact if the failure deceives or tends to deceive;
 Section 13–301 of the Commercial Law Article, Maryland Code (1975, 2005 Repl. Vol.).
 Section 13–303 states:
 A person may not engage in any unfair or deceptive trade practice, as defined in this subtitle or as further defined by the Division, in:
 (1) The sale, lease, rental, loan, or bailment of any consumer goods, consumer realty, or consumer services;
 (2) The offer for sale, lease, rental, loan, or bailment of consumer goods, consumer realty, or consumer services;
 (3) The extension of consumer credit; or
 (4) The collection of consumer debts.
 Section 13–303 of the Commercial Law Article, Maryland Code (1975, 2005 Repl. Vol.). Effective January 1, 2006, Section 13–301 of the Commercial Law Article was amended to add another subsection, but the quoted language remains unchanged. All subsequent references to

dency and effect of misleading the movants in connection with their purchases of the condominiums in Tomes Landing Condominiums." MRA and the Association appealed the grant of partial summary judgment to the Court of Special Appeals, but, while that appeal was pending, both MRA and the Association, as well at the unit purchasers, filed Petitions for Writs of Certiorari. We granted both Petitions, 402 Md. 352, 936 A.2d 850 (2007), to consider the following questions, the first presented by the unit purchasers and the remainder, rephrased for clarity and brevity, presented by MRA and the Association: [3]

---

the Consumer Protection Act are to the Commercial Law Article, Maryland Code (1975, 2005 Repl.Vol.).

3. Questions two through five have been rephrased using the language from MRA and the Association's brief before us. The questions presented in their Petition, however, were:
 I. Where § 11–135 of the Maryland Condominium Act specifically delineates the 12 items to be included in a resale certificate given to the purchasers of a condominium unit, and this Court held, in *Swinson v. Lords Landing Village Condominium,* that a council of unit owners need not make disclosures beyond the items delineated in § 11–135, does the Consumer Protection Act impose a duty upon the council of unit owners and its agent to disclose information not mandated by the Condominium Act?
 A. Does the Condominium Act, which delineates the information the council of units owners must disclose in a resale certificate, control over the more general obligations set forth in the Consumer Protection Act?
 B. Do the council of unit owners and its agent qualify as "merchants" under the Consumer Protection Act by providing information in a resale certificate pursuant to the statutory duty created by § 11–135 of the Condominium Act?
 C. Can providing a resale certificate that adheres to the requirements of the Condominium Act qualify as an unfair or deceptive trade practice under the Consumer Protection Act when the resale certificate is not provided "in the sale or offer for sale" of consumer realty?
 II. If the Consumer Protection Act applies to a council of unit owners' disclosure responsibilities under § 11–135 of the Condominium Act, is a finding of a violation of §§ 13–301 and 13–303 of the Consumer Protection Act dependant upon evidence of knowledge on the part of the council or its managing agent, at the time of the sale of a unit, of the severity of damage to the condominium buildings and the magnitude of a potential future assessment on unit owners to pay for repairs?

1. Does the Maryland Consumer Protection Act apply to representations made to the purchasers of condominium units in the sale, or offer for sale, of their condominium units?

2. Whether the trial court erred in finding as a matter of law that the Association and MRA had a further duty to Appellees under the Consumer Protection Act to disclose information beyond that required by § 11–135 of the Maryland Condominium Act, despite this Court's holding in *Swinson v. Lords Landing Village Condominium* [360 Md. 462, 758 A.2d 1008 (2000)] that the MCA's disclosure provisions were definite and limited and required no disclosures beyond those items specifically delineated in § 11–135.

3. Whether the trial court erred in holding that the operating budgets provided by the Association and MRA pursuant to § 11–135 were misleading as a matter of law, when the preparation and disclosure of the operating budgets complied fully with the requirements of §§ 11–109.2 and 11–135 of the Maryland Condominium Act.

4. Whether the trial court erred in holding, as a matter of law, despite the existence of genuine issues of material

III. Is it error for a trial court to enter judgment as a matter of law against a condominium association and its managing agent on a unit owners' Consumer Protection Act claims based upon alleged failure to disclose the potential for future assessments to repair damage to condominium buildings where:
A. genuine issues of material fact exist as to when the association and its agent became aware of the magnitude of damage to the condominium buildings, the cost to repair such damage, and the necessity of approving a special assessment to pay for such repairs?
B. genuine issues of material fact exist as to whether the purchasing unit owners were aware, before purchasing their respective units, of damage to condominium buildings?
IV. Is it error for a trial court to find that a current operating budget provided by a condominium association to selling unit owners pursuant to § 11–135 of the Condominium Act had the capacity, tendency, and effect of misleading the purchasing unit owners without any expert testimony indicating that an operating budget should include a line item for unapproved capital expenses?

fact, that the Association and MRA knew at the time of the sale of the units to Appellees that existing construction issues would necessitate major structural repairs to buildings and an assessment of costs to unit owners, when there was evidence that the severity of the construction issues became evident after most, if not all, of the sales had taken place.

5. Whether the trial court erred in finding that the Association and MRA were "merchants" involved "in the sale of consumer realty" within the meaning of the Consumer Protection Act, when neither the Association nor MRA sold or offered for sale consumer realty, and neither was involved in the sale of any condominium unit.

(internal footnotes omitted).

For the reasons set forth below, we shall hold that the Maryland Consumer Protection Act could apply to disclosures made in a resale certificate by a condominium association and its management company during the sale of a condominium and that there exists a dispute of material facts as to whether the operating budgets provided by MRA and the Association to the unit purchasers constituted unfair or deceptive trade practices under the Consumer Protection Act.

This case has its origins in a suit filed by the unit purchasers in the Circuit Court for Cecil County, alleging multiple violations of the Consumer Protection Act and the Maryland Condominium Act,[4] as well as common law torts, stemming from MRA and the Association's representations that there were no known health or building code violations at Tomes Landing and that the operating budgets reflected that repair expenses in the community were declining, at a time when MRA and the Association knew they were climbing. The impetus for the suit was a special assessment that was im-

---

**4.** All references hereinafter to the Maryland Condominium Act are to Title 11 of the Real Property Article, Maryland Code (1974, 2003 Repl.Vol.). The pertinent language in the 2010 volume of the Article remains the same, unless otherwise noted.

posed on all unit owners in December of 2004 to pay for water damage to the buildings allegedly resulting from improper construction and flashing that caused water to seep behind the building facades and threaten the structural integrity of the buildings. The unit purchasers alleged that the extent of the water damage had been known to MRA and the Association since 1996. The second amended complaint filed by the unit purchasers included a total of thirteen counts.[5]

The first count alleged that MRA committed fraud when it submitted the operating budgets to prospective purchasers as part of the resale package. Specifically, the unit purchasers alleged that MRA knew of the estimated cost of the necessary, extensive repairs, but did not include this information in the line item on the budget for repairs. The complaint also asserted that MRA represented to the unit purchasers that it had corrected "any defective conditions in [Plaintiff's] units" when it knew that the steps taken to correct these problems were ineffective. These representations were made, according to the unit purchasers, with knowledge of their falsehood and with the intent to defraud them.

Counts two and ten alleged a violation of Section 13–301(1) of the Consumer Protection Act by MRA and the Association, respectively. These counts contain allegations that MRA and the Association knew of the defective nature of the property, the existence of health and building code violations, and the need for substantial repairs, prior to creating the resale packages for the prospective purchasers, but did not indicate that these problems would cause substantial increases in the amount paid for repairs, including a special assessment. The counts contain the assertion that MRA and the Association knew the operating budgets provided to the purchasers materially understated the cost of anticipated repairs and did nothing to correct or note this understatement, which mislead the purchasers.

---

5. The unit purchasers' complaint was first amended by interlineation to add a party and was amended a second time to clarify and modify language throughout the various allegations.

Counts three and eleven alleged that MRA and the Association violated Section 13–301(2) of the Consumer Protection Act.[6] The unit purchasers based these allegations on the same conduct as counts two and ten, and further allege that MRA and the Association also violated Section 13–301(2) by "represent[ing] that the Tomes Landing Condominiums, and its constituent components, had a sponsorship, approval, characteristic, use, benefit and/or quantity that they did not have" because the condominiums "contained . . . extensive defects and deficiencies."

The unit purchasers also alleged in counts four and twelve that MRA and the Association violated Section 13–301(3) of the Consumer Protection Act because "the Plaintiffs were not told that extensive water leakage had been experienced . . . and that such leaks would continue and become more severe absent costly and extensive repairs . . . ." Counts four and twelve also contain allegations that MRA and the Association failed to disclose known health and building code violations and that MRA and the Association failed to disclose knowledge of the threat of structural problems with the buildings.

Count five alleged that MRA violated Section 13–301(9) of the Consumer Protection Act[7] by failing to disclose "any

---

6. Section 13–301(2) of the Consumer Protection Act states that unfair or deceptive trade practices include:
 (2) Representation that:
 (i) Consumer goods, consumer realty, or consumer services have a sponsorship, approval, accessory, characteristic, ingredient, use, benefit, or quantity which they do not have;
 (ii) A merchant has a sponsorship, approval, status, affiliation, or connection which he does not have;
 (iii) Deteriorated, altered, reconditioned, reclaimed, or secondhand consumer goods are original or new; or
 (iv) Consumer goods, consumer realty, or consumer services are of a particular standard, quality, grade, style, or model which they are not;
 Section 13–301(2) of the Consumer Protection Act.

7. Section 13–301(9) of the Consumer Protection Act states that unfair or deceptive trade practices include:
 (9) Deception, fraud, false pretense, false premise, misrepresentation, or knowing concealment, suppression, or omission of any material

information regarding the existence, nature and/or extent of the known defects in the construction of the Tomes Landing Condominiums." The count contained assertions that MRA should have informed prospective purchasers of the need for future repairs, any violations of the health or building codes, "the threat of structural inadequacy," and that the operating budgets did not include an expected, massive outlay for repairs.

In counts six and thirteen, the unit purchasers alleged that the conduct described in the preceding counts constituted a violation of Section 13–303 of the Consumer Protection Act, that MRA and the Association took "unfair advantage of the lack of knowledge, ability, and experience" of the purchasers, that the alleged defects could not be discovered by purchasers because they were hidden or latent defects, and that MRA and the Association took unfair advantage of the "gross disparity between the knowledge and expertise of the consumers and MRA."

Counts seven and nine alleged that MRA and the Association negligently misrepresented the information provided to prospective buyers. They specifically asserted that MRA and the Association had a duty, imposed by the Maryland Condominium Act, to furnish certain information, including a statement of known building or health code violations and a current operating budget. The unit purchasers alleged that MRA and the Association negligently misrepresented the information they provided to the purchasers with respect to these two mandatory disclosures because they knew or should have known of building code violations and they negligently misrep-

---

fact with the intent that a consumer rely on the same in connection with:

(i) The promotion or sale of any consumer goods, consumer realty, or consumer service;

(ii) A contract or other agreement for the evaluation, perfection, marketing, brokering or promotion of an invention; or

(iii) The subsequent performance of a merchant with respect to an agreement of sale, lease, or rental[.]

Section 13–301(9) of the Consumer Protection Act.

resented the budget information by failing to include any line item, or an addendum, for the anticipated repairs.

Count eight alleged that MRA was liable to the unit purchasers because of its breach of its contract with the Association, in which MRA agreed to prepare the resale packages provided to each prospective purchaser, by providing a misleading budget to prospective purchasers, failing to disclose contemplated capital expenditures, and not providing information regarding compliance with the health and building codes. The unit purchasers alleged that they were known and intended third-party beneficiaries to that contract and could assert a cause of action for breach thereof.[8]

The unit purchasers herein bought their units in the Tomes Landing Condominium complex between 2000 and 2004 from previous owners.[9] The Association is a nonprofit entity comprised of all unit owners and is governed by a Board of Directors (Board) who are all volunteer members elected by the unit owners, while MRA was the property management company responsible for managing the Tomes Landing Complex under a contract dated May 1, 1993. The operating budgets in the resale certificates provided the actual operating budget being used for that current year, the actual, year-to-date expenditures, and the proposed budget for the upcoming year.

Prior to trial, some unit purchasers filed a Motion for Partial Summary Judgment in which those who had purchased

---

**8.** The docket entries in this case indicate that, subsequent to the grants of partial summary judgment, counts one, three, five, seven, eight, nine, and eleven were dismissed with prejudice by the trial judge, upon motion of the unit purchasers. Only counts two, four, six, ten, twelve, and thirteen remain viable and were the subject of the partial summary judgment.

**9.** The Maryland Condominium Act imposes different disclosure requirements for sales involving the builder and a prospective buyer than those applicable to a transaction between a current owner and a prospective owner. *Compare* Md.Code (1974, 2003 Repl.Vol.) § 11–126 of the Real Property Article *with* Md.Code (1974, 2003 Repl.Vol.) § 11–135 of the Real Property Article. All the unit purchasers purchased their units from an owner.

their units between January 1, 2003 and December 31, 2004 [10] alleged that the Maryland Condominium Act created a duty to provide the operating budgets to prospective buyers, and the Consumer Protection Act regulated the manner in which MRA and the Association were to carry out this duty. Thus, the unit purchasers argued, MRA and the Association could not have discharged their duties merely by complying with the provisions of the Maryland Condominium Act if doing so could violate the Consumer Protection Act. They further argued that, even though neither MRA nor the Association was a direct seller of the condominium units, they were liable under the principle espoused in *Hoffman v. Stamper*, 385 Md. 1, 867 A.2d 276 (2005), in which we held that an appraiser could be held liable under the Consumer Protection Act for false and misleading appraisals created for the sale of a house, even though the appraiser was not the direct seller. Subsequent to the first motion being granted, a second group of unit purchasers, those who bought their units between January 1, 2000 and June 12, 2003,[11] moved for partial summary judgment on the same counts and under the same theories as those of the first group.

MRA and the Association replied and also filed Cross Motions for Summary Judgment in which they argued that they were entitled to summary judgment because the Consumer Protection Act did not apply to them because they were not the sellers, or merchants, in the condominium sales transactions. They further argued that the Maryland Condominium Act imposed specific disclosure requirements upon them, which they met, and which discharged them from any liability as a matter of law.

---

10. These purchasers were: Beer (Trustee), Boling, Claus, Gomish, Halupke, Ko, Kraft, McGinn, Mueller, Owens and Lehnert, Roehm, John and Judy Schlecht, John and Dinah Schlecht, Siwek and Ashworth.

11. These purchasers were: Armstrong, Conover, Jones, Green and Kettell, Lina, Maciejeski, Stalcup, Sugar, and Schaefer.

After numerous other pleadings were filed and a hearing, the trial judge granted partial summary judgment in favor of the unit purchasers [12] and held that the Association and MRA were liable as a matter of law under the Consumer Protection Act for their representations in the operating budgets contained in the resale certificate that indicated expenses had declined from the prior year to the current year:

> But I find from the undisputed facts in the case that the operating budgets which were provided to the movants prior to their purchases of their condos had the capacity, tendency and effect of misleading the movants in connection with their purchases of the condominiums in Tomes Landing Condominiums.
>
> And further, as the result, the furnishing of these materially misleading budgets to the movants constituted an unfair or deceptive trade practice in violation of Sections 13–301(1), 13–301(3), and 13–303 of the Maryland Consumer Protection Act.
>
> And based on the factual evidence attached to this motion I conclude that no reasonable fact finder could conclude otherwise.
>
> And for these reasons the movants are entitled as a matter of law to a judgment of liability against the Association and MRA for violations of the Consumer Protection Act under Courts 2, 4, 6, 10, 12, and 13 of the Second Amended Complaint.

Thereafter, MRA and the Association noted an appeal to the Court of Special Appeals, consolidating their challenges of both grants of summary judgment into one appeal. While the matter was pending before the Court of Special Appeals, both sides filed Petitions for a Writ of Certiorari to this Court, which we granted, 402 Md. 352, 936 A.2d 850 (2007).

---

**12.** The entries of partial summary judgment were made on December 18th, 2006 with respect to the plaintiffs who had purchased their units between January 1, 2003 and December 31, 2004 and on April 26, 2007 with respect to the plaintiffs who had purchased their units between January 1, 2000 and June 12, 2003.

After granting the Petitions for a Writ of Certiorari while the matter was pending before the Court of Special Appeals, and after hearing arguments, we filed an opinion that vacated the grant of summary judgment, opining that the Consumer Protection Act does apply, but MRA and the Association were required to disclose only approved, not proposed or contemplated, capital expenditures in the operating budgets they provided to prospective purchasers. We remanded the case, however, to consider whether MRA and the Association violated Section 11–135(a)(4)(x) [13] of the Maryland Condominium Act by not disclosing conditions that could constitute building or health code violations. Both MRA and the Association, as well as the unit purchasers, filed Motions for Reconsideration of our previous opinion. MRA and the Association argued that we improperly considered, and remanded for the trial court's consideration of, whether MRA and the Association were required to disclose building conditions that may have been code violations but were never charged as such under the Maryland Condominium Act, because that issue was not preserved for our consideration.

The unit purchasers argued that we expressly should have decided whether the operating budgets, as provided to the purchasers, violated the Consumer Protection Act, and that this Court should expressly have stated that an entity can comply with the Maryland Condominium Act's disclosure provisions, but do so in a manner that violates the Consumer Protection Act; they also conceded that they did not assert a violation of Section 11–135(a)(4)(x) of the Maryland Condominium Act as a basis for liability under the Consumer Protection Act when moving for summary judgment. As a result of our

---

**13.** Section 11–135(a)(4)(x) of the Maryland Condominium Act states, in relation to what a condominium association must provide to a prospective buyer,

> (x) A statement as to whether the council of unit owners has knowledge of any violation of the health or building codes with respect to the unit, the limited common elements assigned to the unit, or any other portion of the condominium[.]

Section 11–135(a)(4)(x) of the Maryland Condominium Act.

granting the Motions for Reconsideration, we now consider the questions originally presented.

Before considering the questions presented, we believe it is helpful, from the outset, to set forth the distinctions between a condominium, a condominium unit, and a council of unit owners, because this case implicates the role of a council of unit owners or a condominium association in the sale of a condominium unit. In *Ridgely Condominium Ass'n v. Smyrnioudis*, 343 Md. 357, 681 A.2d 494 (1996), we had an opportunity to discuss the relationship between condominiums and condominium units and explained the unit owner's "hybrid property interest":

> A condominium is a "communal form of estate in property consisting of individually owned units which are supported by collectively held facilities and areas." *Andrews v. City of Greenbelt*, 293 Md. 69, 71, 441 A.2d 1064 (1982).
>
> > The term condominium may be defined generally as a system for providing separate ownership of individual units in multiple-unit developments. In addition to the interest acquired in a particular apartment, each unit owner also is a tenant in common in the underlying fee and in the spaces and building parts used in common by all the unit owners.
>
> 4B Richard R. Powell, *Powell on Real Property* ¶ 632.1[4] (1996). A condominium owner, therefore, holds a hybrid property interest consisting of an exclusive ownership of a particular unit or apartment and a tenancy in common with the other co-owners in the common elements.

*Ridgely Condominium Ass'n*, 343 Md. at 358–59, 681 A.2d at 495. The creation and responsibilities of the council of unit owners of a condominium is set forth, in part, by Section 11–109 of the Maryland Condominium Act, which explicates the largely maintenance and fee-collection roles of the entity.[14]

---

**14.** Section 11–109 of the Maryland Condominium Act, discussing the roles of condominium associations, provides:

(a) *Legal entity; composition.*—The affairs of the condominium shall be governed by a council of unit owners which, even if unincorporated, is constituted a legal entity for all purposes. The council of unit owners shall be comprised of all unit owners.

(b) *Delegation of powers.*—The bylaws may authorize or provide for the delegation of any power of the council of unit owners to a board of directors, officers, managing agent, or other person for the purpose of carrying out the responsibilities of the council of unit owners.

* * *

(d) *Council—Incorporation and powers.*—The council of unit owners may be either incorporated as a nonstock corporation or unincorporated and it is subject to those provisions of Title 5, Subtitle 2 of the Corporations and Associations Article which are not inconsistent with this title. The council of unit owners has, subject to any provision of this title, and except as provided in paragraph (22) of this subsection, the declaration, and bylaws, the following powers:

(1) To have perpetual existence, subject to the right of the unit owners to terminate the condominium regime as provided in § 11–123 of this title;

(2) To adopt and amend reasonable rules and regulations;

(3) To adopt and amend budgets for revenues, expenditures, and reserves and collect assessments for common expenses from unit owners;

(4) To sue and be sued, complain and defend, or intervene in litigation or administrative proceedings in its own name on behalf of itself or two or more unit owners on matters affecting the condominium;

(5) To transact its business, carry on its operations and exercise the powers provided in this subsection in any state, territory, district, or possession of the United States and in any foreign country;

(6) To make contracts and guarantees, incur liabilities and borrow money, sell, mortgage, lease, pledge, exchange, convey, transfer, and otherwise dispose of any part of its property and assets;

(7) To issue bonds, notes, and other obligations and secure the same by mortgage or deed of trust of any part of its property, franchises, and income;

(8) To acquire by purchase or in any other manner, to take, receive, own, hold, use, employ, improve, and otherwise deal with any property, real or personal, or any interest therein, wherever located;

(9) To hire and terminate managing agents and other employees, agents, and independent contractors;

(10) To purchase, take, receive, subscribe for or otherwise acquire, own, hold, vote, use, employ, sell, mortgage, loan, pledge or otherwise dispose of, and otherwise use and deal in and with, shares or other interests in, or obligation of corporations of the State, or foreign corporations, and of associations, partnerships, and individuals;

(11) To invest its funds and to lend money in any manner appropriate to enable it to carry on the operations or to fulfill the purposes named in the declaration or bylaws, and to take and to hold real and personal property as security for the payment of funds so invested or loaned;

Section 11–108.1 of the Maryland Condominium Act also charges the council of unit owners with the responsibilities of repair and maintenance of the common elements:

(12) To regulate the use, maintenance, repair, replacement, and modification of common elements;

(13) To cause additional improvements to be made as a part of the general common elements;

(14) To grant easements, rights-of-way, licenses, leases in excess of 1 year, or similar interests through or over the common elements in accordance with § 11–125(f) of this title;

(15) To impose and receive any payments, fees, or charges for the use, rental, or operation of the common elements other than limited common elements;

(16) To impose charges for late payment of assessments and, after notice and an opportunity to be heard, levy reasonable fines for violations of the declaration, bylaws, and rules and regulations of the council of unit owners, under § 11–113 of this title;

(17) To impose reasonable charges for the preparation and recordation of amendments to the declaration, bylaws, rules, regulations, or resolutions, resale certificates, or statements of unpaid assessments;

(18) To provide for the indemnification of and maintain liability insurance for officers, directors, and any managing agent or other employee charged with the operation or maintenance of the condominium;

(19) To enforce the implied warranties made to the council of unit owners by the developer under § 11–131 of this title;

(20) To enforce the provisions of this title, the declaration, bylaws, and rules and regulations of the council of unit owners against any unit owner or occupant;

(21) Generally, to exercise the powers set forth in this title and the declaration or bylaws and to do every other act not inconsistent with law, which may be appropriate to promote and attain the purposes set forth in this title, the declaration or bylaws; and

(22) To designate parking for individuals with disabilities, notwithstanding any provision in the declaration, bylaws, or rules and regulations.

(e) *Unit owner's interest in council's property.*—A unit owner may not have any right, title, or interest in any property owned by the council of unit owners other than as holder of a percentage interest in common expenses and common profits appurtenant to his unit.

(f) *Unit owner's rights as holder of percentage interest.*—A unit owner's rights as holder of a percentage interest in common expenses and common profits are such that:

(1) A unit owner's right to possess, use, or enjoy property of the council of unit owners shall be as provided in the bylaws; and

(2) A unit owner's interest in the property is not assignable or attachable separate from his unit except as provided in §§ 11–107(d) and 11–112(g) of this title.

Except to the extent otherwise provided by the declaration or bylaws, and subject to § 11–114 of this title, the council of unit owners is responsible for maintenance, repair, and replacement of the common elements, and each unit owner is responsible for maintenance, repair, and replacement of his unit.

Section 11–108.1 of the Maryland Condominium Act.[15]

A condominium association generally is created through the adoption of bylaws, which impose numerous contractual obligations on the unit owners and the condominium association. The applicable bylaws governing the Tomes Landing Condominium Association provide that the Council of Unit Owners will be responsible for estimating total operating expenses for the Condominium Association and for raising funds to provide for the care and maintenance of the condominium for the ensuing year; the unit owners, in return, are responsible for paying to the association a monthly fee for operating expenses, maintenance and repair, related to their percentage ownership interest:

*ARTICLE III*

*ADMINISTRATION*

Section 1. *Council Responsibilities.* The Council of the Unit Owners will be comprised of every person, firm or corporation which owns, severally or with others, any Unit and will constitute "Tome's Landing Condominium Association, Incorporated" (hereinafter referred to as "Council" or "Council of Unit Owners") who will have responsibility for administering the project, electing members of the Board of Directors, establishing and collecting monthly assessments and arranging for the management of the project. Except

---

**15.** Effective June 1, 2009, Section 11–108.1 was amended, subsequent to the facts underlying this case, to add "and subject to § 11–114 of this title." Section 11–114 of the Maryland Condominium Act governs the required insurance coverage that a council of unit owners must maintain and is not relevant to the matter now before us.

as otherwise provided, decisions and resolutions of the Council shall require approval by a majority of Unit Owners present and voting, in person or by proxy.

\*　　\*　　\*

## ARTICLE VII

## OBLIGATIONS OF THE OWNERS

Section 1.　*Assessments: Liens; Furnishing of Certificates*
(a) The fiscal year of the Council shall consist of twelve (12) calendar months, commencing on January 1. Not later than sixty (60) days prior to the commencement of each fiscal year, the Board of Directors shall estimate the total common expenses required for the operation and maintenance of the Condominium during the ensuing year, including particularly, but not by way of limitations, all sums required for the items set forth in Section 11–109.2 of the Condominium Act and all sums required to provide labor, materials, services, utilities and insurance for the operation, maintenance and care of the Condominium and the conveniences deemed desirable to the use and enjoyment thereof, together with a reasonable amount deemed necessary by the Board of Directors as an operating reserve for contingencies and an adequate reserve for repair and replacement of the Common Elements. Within fifteen (15) days thereafter, the Board of Directors shall notify each Unit Owner, in writing, of the proposed budget listing each expense for the coming fiscal year and such Unit Owner's proportionate share of the aggregate estimated common expenses, based on his percentage interest in the common profits and expenses....
(b) The Board of Directors shall establish and maintain a reasonable reserve operating fund and an adequate reserve repair and replacement fund....
(c) If the Board of Directors at any time determines that the common expenses assessed under paragraph (a) of this Section 1, or the reserve funds established under paragraph (b) of this Section 1, are inadequate, or that additional funds

are otherwise required for the operation and maintenance of the Condominium, it may assess such further sums, as common expenses, as it may deem necessary and levy the same against each Unit Owner in accordance with his percentage interest in the common profits and expenses. However, any expenditure made, other than those made because of conditions which, if not corrected, could reasonably result in a threat to the health or safety of the Unit Owners or a significant risk of damage to the Condominium, that would result in an increase in an amount of assessments for the current fiscal year of the Condominium in excess of fifteen percent (15%) of the budgeted amount previously adopted, shall have the assent of Unit Owners representing fifty-one percent (51%) of the total votes in the Condominium, at a special meeting of the Council called for this purpose. . . .

(d) Each Unit Owner shall be personally obligated to pay to the Board of Directors, or its designee, the common expenses or other expenses levied against him by the Board of Directors under any of the provisions of the Declaration or these By–Laws.

 Although the bylaws create contractual duties among the council of unit owners and the unit owners, the duties do not extend to a prospective buyer; there simply does not exist contractual privity between the council of unit owners and the buyer of a unit. *Swinson v. Lords Landing Village Condominium*, 360 Md. 462, 477, 758 A.2d 1008, 1016 (2000). Section 11–135 of the Maryland Condominium Act, however, imposes a duty upon councils of unit owners to provide buyers with a "resale certificate" when a unit is resold. *Id.* at 477–78, 758 A.2d at 1016–17; Section 11–135 of the Maryland Condominium Act.[16] The resale certificate provided by the council of unit owners is to contain:

---

**16.** Section 11–135(a) of the Maryland Condominium Act states that, except for condominiums containing less than seven units, the applicable rules for which are outlined in subsection (b), "a contract for the resale of a unit by a unit owner other than a developer is not enforce-

(i) A statement disclosing the effect on the proposed conveyance of any right of first refusal or other restraint on the free alienability of the unit other than any restraint created by the unit owner;

(ii) A statement setting forth the amount of the monthly common expense assessment and any unpaid common expense or special assessment currently due and payable from the selling unit owner;

(iii) A statement of any other fees payable by the unit owners to the council of unit owners;

(iv) A statement of any capital expenditures approved by the council of unit owners planned at the time of the conveyance which are not reflected in the current operating budget disclosed under subparagraph (vi) of this paragraph;

(v) The most recent regularly prepared balance sheet and income expense statement, if any, of the condominium;

(vi) *The current operating budget of the condominium including details concerning the reserve fund for repair and replacement and its intended use, or a statement that there is no reserve fund;*

(vii) A statement of any judgments against the condominium and the existence of any pending suits to which the council of unit owners is a party;

(viii) A statement generally describing any insurance policies provided for the benefit of unit owners, a notice that copies of the policies are available for inspection, stating the location at which the copies are available, and a notice that the terms of the policy prevail over the description;

(ix) A statement as to whether the council of unit owners has knowledge that any alteration or improvement to the unit or to the limited common elements assigned to the unit violates any provision of the declaration, bylaws, or rules or regulations;

---

able unless ... the unit owner furnishes to the purchaser not later than 15 days prior to closing: (1) A copy of the declaration (other than the plats); (2) The bylaws; (3) The rules or regulations of the condominium; (4) A [resale] certificate...."

(x) *A statement as to whether the council of unit owners has knowledge of any violation of the health or building codes with respect to the unit, the limited common elements assigned to the unit, or any other portion of the condominium;*

(xi) A statement of the remaining term of any leasehold estate affecting the condominium and the provisions governing any extension or renewal thereof; and

(xii) A description of any recreational or other facilities which are to be used by the unit owners or maintained by them or the council of unit owners, and a statement as to whether or not they are to be a part of the common elements[.]

Section 11–135(a)(4) of the Maryland Condominium Act (emphasis added). Subsection (vi) is the part of the Condominium Act that provides the basis for the partial summary judgment granted in this case, while subsection (x) is the basis upon which our earlier opinion was rendered.[17]

---

**17.** MRA, the Association, and the unit purchasers all agree that a violation of subsection (x) was not included as a basis upon which partial summary judgment was granted in the present case. We have often opined that our review of a grant of summary judgment is limited to "only the grounds upon which the trial court relied in granting summary judgment." *River Walk Apartments, LLC v. Twigg*, 396 Md. 527, 542, 914 A.2d 770, 779 (2007), quoting *Standard Fire Ins., Co. v. Berrett*, 395 Md. 439, 451, 910 A.2d 1072, 1079 (2006). The trial judge in this case stated that "the furnishing of these materially misleading budgets to the movants constituted an unfair or deceptive trade practice. . . . And for these reasons the movants are entitled as a matter of law to a judgment of liability. . . ." Thus, the issue of whether MRA and the Association complied with Section 11–135(a)(4)(x) did not form the basis for the grant of summary judgment and is not before us.

Further, the unit purchasers abandoned their argument regarding known but uncharged building and health code violations during one of the hearings on the Motion for Partial Summary Judgment:

But putting it aside, even assuming U.S. Inspect did inform the defendants there were no building code violations, that disputed fact would not defeat this motion because it doesn't change the misleading nature of the 2000, 2001 and 2002 budgets furnished to the Movants. These budgets contained misleading representations concerning the need for and cost of required repairs, not concerning the existent [sic] or nonexistence of building code violations.

So again it is not material to the outcome of this case.

The Consumer Protection Act proscribes "unfair or deceptive trade practice ... in: (1) [t]he sale, lease, rental, loan, or bailment of any consumer goods, consumer realty, or consumer services[.]" Section 13–303 of the Consumer Protection Act.[18] The Act defines a "sale" as including any "(1) [s]ale of or offer or attempt to sell ... real property ...," a "[c]onsumer" as "an actual or prospective purchaser, lessee, or recipient of

---

Moreover, in her own hypothetical during the original oral argument before us, counsel for the unit purchasers also conceded that a condominium association's omission of conditions amounting to a potential, but not charged, building code violation would not violate the Condominium Act:

> Another example, how about a building code violation. There's no building code violation that's been issued to the condominium association, so technically you can comply with 11–135, not disclose, you can say "There are no known building code violations" 'cause there's no formal issued violation. But how about if a week earlier, or a month earlier, an engineer said, "You have a major problem. You've got multiple building code violations with this home." Ok, you might technically comply with 11–135 by saying "No, there are no building code violations."

In their brief, counsel for the buyers also asserted that "Appellees do not contend, as MRA and the Association mistakenly argue, that Appellants were obligated under § 11–135 to disclose the existence of construction defects...."

Even if we were to consider this issue, however, MRA and the Association would be entitled to summary judgment with respect to an alleged violation of Section 11–135(a)(4)(x) because notice of a violation of the health or building codes was never received by MRA or the Association. In *Swinson v. Lords Landing Village Condominium*, 360 Md. 462, 758 A.2d 1008 (2000), we held that Section 11–135(a)(4)(x) did not require a council of unit owners to disclose a Violation Notice pursuant to the Prince George's County Housing Code in the resale certificate. 360 Md. at 481, 758 A.2d at 1018. Under a plain reading of the statute, we held that the omission of the Violation Notice from the resale certificate did not provide the buyer, Swinson, with a basis for relief, because Section 11–135(a)(4)(x) involves only *known* violations of health or building codes, not housing codes. Thus, it is knowledge of a charged violation thereof, rather than the conduct underlying the violation, that requires disclosure under Section 11–135(a)(4)(x). Because they were never issued a notice of any such violations, MRA and the Association could not have violated Section 11–135(a)(4)(x).

18. Effective June 1, 2011, Section 13–303 was amended to add a new subsection relating to educational services. The quoted language remained unchanged.

... consumer realty," Section 13–101, and an unfair or deceptive trade practice to include any:

(1) False, falsely disparaging, or misleading oral or written statement, visual description, or other representation of any kind which has the capacity, tendency, or effect of deceiving or misleading consumers;

(2) Representation that:

(i) Consumer goods, consumer realty, or consumer services have a sponsorship, approval, accessory, characteristic, ingredient, use, benefit, or quantity which they do not have;

\* \* \*

(iv) Consumer goods, consumer realty, or consumer services are of a particular standard, quality, grade, style, or model which they are not;

(3) Failure to state a material fact if the failure deceives or tends to deceive;

\* \* \*

(9) Deception, fraud, false pretense, false premise, misrepresentation, or knowing concealment, suppression, or omission of any material fact with the intent that a consumer rely on the same in connection with:

(i) The promotion or sale of any consumer goods, consumer realty, or consumer service;

(ii) A contract or other agreement for the evaluation, perfection, marketing, brokering or promotion of an invention; or

(iii) The subsequent performance of a merchant with respect to an agreement of sale, lease, or rental;

\* \* \*

(13) Use by a seller, who is in the business of selling consumer realty, of a contract related to the sale of single family residential consumer realty, including condominiums and town houses, that contains a clause limiting or preclud-

ing the buyer's right to obtain consequential damages as a result of the seller's breach or cancellation of the contract[.] Section 13–301 of the Consumer Protection Act.

█ Here, seminally, we have been asked to consider, in the context of a condominium sale, whether the association and its management firm can be held liable under the Consumer Protection Act for the issuance of a resale certificate containing an operating budget alleged to be deceptive. In arguing that they cannot be, the Association and MRA rely, for the principle that they are not the sellers, on our decision in *Swinson v. Lords Landing Village Condominium,* 360 Md. 462, 758 A.2d 1008 (2000), in which a condominium association, Lords Landing Village Condominium, sued Winifred Swinson, a condominium unit owner, for an unpaid special assessment, which had been imposed to defray the costs of repairing or replacing rotted and exposed wood and flaking paint on the exterior of the building. Ms. Swinson counterclaimed for fraud, alleging that at the time of her purchase, Lords Landing Village Condominium had violated Section 13–103 of the Prince George's County Housing Code, which stated that a "seller ... shall be responsible for compliance with all issued notices of violations ... against or affecting the property at the date of execution...." [19] Specifically, Ms. Swinson argued that the prior unit owner was financially responsible for making necessary repairs to the condominium under Section 13–103 of the Prince George's County Housing Code, because the council of unit owners had already received a violation

---

**19.** Section 13–103 of the Prince George's County Housing Code provided:

The seller of a dwelling structure and premises shall be responsible for compliance with all issued notices of violations of this Subtitle or other laws of the County, or actions in any court on account of such violations, against or affecting the property at the date of execution of any agreement of sale or transfer of ownership of such dwelling structure and premises. Nothing contained in his Subtitle shall affect the validity of any sale, transfer or disposition of any interest in real estate.

Section 13–103 of the Prince George's County Code (1999), *cited in Swinson v. Lords Landing Village Condominium,* 360 Md. 462, 472–73, 758 A.2d 1008, 1014 (2000).

notice and was seeking a special assessment on her unit to bring the condominium into compliance at the time she bought her condominium unit.

The district court judge rejected Ms. Swinson's counterclaim for fraud, premised on a violation of Section 13–103 of the Prince George's County Code, holding that Lords Landing Village Condominium was not the seller of the unit, as required under the ordinance. *Id.* at 472, 758 A.2d at 1013. Ms. Swinson appealed to the Circuit Court, which affirmed, holding again that Section 13–103 of the Prince George's County Code was inapplicable because Lord's Landing was not the seller. We granted certiorari and, in discussing the role of a condominium association, agreed that Lords Landing Village Condominium was not the seller for purposes of the alleged Prince George's County Code violation. *Id.* at 474–75, 758 A.2d at 1015.

The unit purchasers, conversely, argue that even if a council of unit owners is not the direct seller of a condominium unit, the Consumer Protection Act should apply, because any deceptive information provided in a resale certificate mandated by the Maryland Condominium Act, upon which a buyer relies, so infects the real estate transaction that the certificate becomes an unfair trade practice "in" the sale or offer of sale of realty to a consumer, relying on *Hoffman v. Stamper,* 385 Md. 1, 867 A.2d 276 (2005). In *Hoffman,* we affirmed a jury verdict against an appraiser under the Consumer Protection Act for fraudulent and deceptive trade practices based on intentionally inflated appraisals in the sale of real estate. Arthur Hoffman, the appraiser, had been a participant in a scheme in which a coconspirator, Robert Beeman, bought dilapidated houses in Baltimore at very low prices, contracted to sell these houses at vastly inflated prices to unsophisticated buyers for only a down payment of five hundred dollars, then used appraisals created by Mr. Hoffman that were also inflated as a basis to assist the buyers in obtaining FHA loans for the remainder of the inflated price. *Id.* at 9, 867 A.2d at 281. After the jury awarded an aggregate judgment of $1,434,020 to the purchasers of the dilapidated properties, Mr. Hoffman,

before us, asserted, among other things, that the evidence was insufficient to establish a violation of the Consumer Protection Act on his part, because, he argued, the deceptive practice "must occur in the sale or offer for sale to consumers," and that he did not sell any consumer realty or offer any consumer services to any of the plaintiffs; he merely provided appraisals. *Id.* at 31, 867 A.2d at 294.

We did not directly address whether Mr. Hoffman was a direct seller because, in limited circumstances, liability under the Consumer Protection Act may extend to one who is not the direct seller: "[i]t is quite possible that a deceptive trade practice committed by someone who is not the seller would so infect the sale or offer for sale to a consumer that the law would deem the practice to have been committed 'in' the sale or offer for sale." *Hoffman,* 385 Md. at 32, 867 A.2d at 294, quoting *Morris v. Osmose Wood Preserving,* 340 Md. 519, 541, 667 A.2d 624, 635 (1995). Based, in part, on this principle, we affirmed the entry of judgment on the Consumer Protection Act count.

It is true that, in *Swinson,* we acknowledged that a council of unit owners is not the direct seller of a condominium, in the context of an action for common law fraud and negligent misrepresentation, not a violation of the Consumer Protection Act. As a result, we did not have occasion to opine on the applicability of the Consumer Protection Act to the sale of a condominium in which a resale certificate was issued by a condominium association and its management company. Rather, our discussion in *Hoffman* regarding the Consumer Protection Act and how it may be violated supports the notion that not being a direct seller is not dispositive.

Analyzing the actions of MRA and the Association under the principle from *Hoffman,* the operating budgets provided by MRA and the Association could have sufficiently implicated them in the entire transaction so as to impose liability under the Consumer Protection Act, given that every plaintiff averred in his or her affidavit that he or she would not have purchased a unit if the budget provided by MRA and the

Association had disclosed the expenses necessary to correct the problems with the condominium buildings. Moreover, the statutory obligation to provide materials to prospective buyers injects MRA and the Association into the sales transaction as central participants because, were they to have failed to provide these materials, the contract for sale would not have been enforceable. Section 11–135(a) of the Maryland Condominium Act. Thus, even though neither MRA nor the Association is the seller in fact, the Consumer Protection Act still could apply to both because their statutory duties could have sufficiently involved them in the sale.

MRA and the Association attempt to distinguish this case from *Hoffman* in three ways. First, they assert that "[i]n *Hoffman,* the false appraisal was part of a scheme to defraud purchasers," while "[h]ere, there is no evidence of any conspiracy to defraud." While MRA and the Association are correct in that *Hoffman* involved an alleged conspiracy to defraud the purchasers, the context of the case was a review of a judgment against Mr. Hoffman after trial; "the evidence more than sufficed to show that Hoffman's erroneous and misleading appraisals directly 'infected' the sales at issue here. They would not have proceeded to closing absent those appraisals." *Hoffman,* 385 Md. at 32, 867 A.2d at 295. The primary focus of *Hoffman* for our purpose on summary judgment is that he was "an integral part of the entire scheme," *id.* at 32, 867 A.2d at 295, just as the disclosures made by MRA and the Association may have been an integral part of the transactions in this case.

Next, MRA and the Association assert that *Hoffman* can be distinguished because the appraisals in that case were created for the purpose of defrauding the purchaser, while the documents created by MRA and the Association were standard documents created in the ordinary course of business. The gravamen of an "unfair or deceptive trade practice" under the Consumer Protection Act is whether the false or misleading statements or representations have "the capacity, tendency, or effect of deceiving or misleading consumers." Section 13–301(1) of the Consumer Protection Act. Thus, the issue is

whether the disclosures were misleading or had the capacity, tendency, or effect of misleading or deceiving.

Finally, MRA and the Association attempt to distinguish *Hoffman* by arguing that the appraiser in *Hoffman* received profit from the transactions in that case, whereas MRA and the Association did not, since they were not involved in the sale. The concept of profit, however, does not infuse the Consumer Protection Act; rather the sole issues is whether MRA and the Association engaged in deceptive trade practices in the sale of consumer realty.

MRA and the Association also raise the spectre that they are not merchants involved in the sale of consumer realty, so the Consumer Protection Act does not apply to them, somehow negating the application of *Hoffman.* In doing so, they rely, in addition to our statement in *Swinson,* on our decision in *Morris v. Osmose Wood Preserving,* 340 Md. 519, 667 A.2d 624 (1995), and the Court of Special Appeals' decision in *Hogan v. Maryland State Dental Ass'n,* 155 Md.App. 556, 843 A.2d 902 (2004). In *Morris,* a group of homeowners filed a class action suit against Osmose Wood Preserving, the manufacturer of plywood used in the construction of the roofing in the homes of the plaintiffs, as well as various builders, alleging, *inter alia,* that Osmose Wood Preserving violated the Consumer Protection Act by selling to builders plywood that degraded under normal roofing conditions, thereby creating a structural hazard, while it was at the same time advertizing that the plywood was suitable for roofing projects. The trial court granted the defendants' motion to dismiss all counts, and the Court of Special Appeals affirmed the dismissal of the Consumer Protection Act counts, reasoning that the Consumer Protection Act did not cover the transaction because the plywood at issue was sold only to commercial buyers and, thus, was not a consumer good.

We granted *certiorari* and a majority of the court agreed that the plaintiff-homeowners could not maintain a cause of action against Osmose Wood Preserving under the Consumer Protection Act. *But see Lloyd v. General Motors Corp.,* 397

Md. 108, 916 A.2d 257 (2007) (reversing the dismissal of a Consumer Protection Act claim against the manufacturers of automobiles). Our holding, however, was based on the fact that Osmose did not sell its goods to a consumer—it sold the plywood only to builders. We explicitly noted that,

> we do not mean that the only entity that can engage in a deceptive trade practice is one who directly sells or offers to sell to consumers. *It is quite possible that a deceptive trade practice committed by someone who is not the seller would so infect the sale or offer for sale to a consumer that the law would deem the practice to have been committed "in" the sale or offer for sale.*

*Id.* at 541, 667 A.2d at 635 (emphasis added).

In *Hogan,* 155 Md.App. 556, 843 A.2d 902 (2004), the Court of Special Appeals affirmed the dismissal of claims under the Consumer Protection Act against the Maryland Dental Association for not having warned about the toxicity of mercury and, in fact, suppressing information about its toxic properties. *Id.* at 561–62, 843 A.2d at 906. In ruling in favor of the Maryland Dental Association, the Court of Special Appeals not only determined that dental fillings are not consumer goods, but also that the Maryland Dental Association did not participate in the offer to sell or the sale of dental fillings, relying on *Morris. Id.* at 564, 843 A.2d at 906. In the instant case, however, the sale of condominium units is covered by the Consumer Protection Act and could be implicated under *Hoffman* and *Morris* because the disclosures of MRA and the Association may have been integral to the transactions.

■ MRA and the Association next argue that, if the Consumer Protection Act applies to them generally, their compliance with the Maryland Condominium Act's disclosure obligations insulates them from liability for false or deceptive trade practices. We disagree.

The Maryland Condominium Act, in Section 11–135, creates duties for MRA and the Association in the sale of a condominium unit. The Consumer Protection Act, on the other hand, establishes boundaries beyond which MRA and the Associa-

tion may not go, unless they wish to be liable for deceptive or unfair trade practices. The Maryland Condominium Act requires disclosures, while the Consumer Protection Act mandates that those disclosures not be deceptive. Section 11–130(a) of the Maryland Condominium Act ("This section is intended to provide *minimum* standards for the protection of consumers in the State." (emphasis added)).

█ Having determined that the Consumer Protection Act could apply, we now turn to the issue of whether it was appropriate for the Circuit Court to have entered summary judgment on the unit purchasers' Consumer Protection Act claims. Under Maryland Rule 2–501, the grant of a motion for summary judgment is appropriate only if "the motion and response show that there is no genuine dispute as to any material fact and that the party in whose favor judgment is entered is entitled to judgment as a matter of law." Rule 2–501(f). The trial judge determined that, as a matter of law, the operating budgets provided by MRA and the Association were deceptive under the Consumer Protection Act.

Although the unit purchasers assert that there is no dispute as to any material facts because the record shows that MRA and the Association knew of the problems with water leakage as early as 1996 from a memorandum from the developer regarding leaks and knew of the widespread nature of the problem and the potential cost of repairs as early as 2000, MRA and the Association argue that the record indicates that they only became aware of the full extent of the damage, and the massive repairs that were required, when a consulting firm delivered its report of major structural damage in August 2004. Additionally, MRA and the Association contend that the record reflects that, because they had been seeking financing from a private lender to cover the repair cost, they were not aware until November 2004, when they exhausted the options for private financing, that they would need to implement a special assessment.

We do not agree with the trial judge that the operating budgets were deceptive as a matter of law. The per se

deception found by the judge was in error because an inference could be drawn from a declining repair budget either that the property was in good condition, because not much money needed to be spent on it or that the property was in poor condition because not much money was being spent on it. Therefore, the entry of summary judgment as a matter of law was inappropriate.

**THE GRANT OF SUMMARY JUDGMENT IS REVERSED. CASE REMANDED TO THE CIRCUIT COURT FOR CECIL COUNTY FOR FURTHER PROCEEDINGS IN ACCORDANCE WITH THIS OPINION. COSTS TO BE PAID BY MRA AND THE ASSOCIATION.**