REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 1015

September Term, 2013

TYRON WHITE

v.

KENNEDY KRIEGER INSTITUTE, INC.

Meredith,
Kehoe,
Friedman,

JJ.

Opinion by Friedman, J.

Filed:  February 26, 2015

As a minor, Appellant Tyron White participated in a lead reduction treatment study facilitated by Appellee Kennedy Krieger Institute. White alleges that while enrolled in the study, and as a result of the tortious conduct of Kennedy Krieger Institute, he was exposed to harmful levels of lead that caused irreparable brain injuries. The trial court dismissed several of White's claims on motions and the jury rejected those that survived. On appeal from the Circuit Court for Baltimore City, White raises three issues that we have reordered and reworded:

1. Whether the trial court erred by providing insufficient jury instructions regarding the duty of care owed by a research institution to a research subject.

2. Whether the trial court erred in concluding that White cannot maintain an action for fraudulent or negligent misrepresentation because, as a two-and-a-half year old at the time, White cannot demonstrate that he relied on any alleged misrepresentation.

3. Whether the trial court erred in concluding that Kennedy Krieger Institute cannot be liable under the Maryland Consumer Protection Act because there was no direct commercial transaction between it and White.

For the reasons that follow, we shall affirm the judgments of the circuit court.

## FACTUAL AND PROCEDURAL HISTORY

### I. The Treatment of Lead-Exposed Children Study

This case arises out of a research study conducted by Kennedy Krieger Institute ("KKI") in Baltimore City in the 1990s called the Treatment of Lead-Exposed Children Study, which was known as the "TLC Study." The TLC Study originated as a partnership between the National Institute of Environmental Health Sciences ("NIEHS"), the Office of Research and Minority Health of the National Institutes of Health, and four separate Clinical Centers in separate cities managed by different entities. KKI oversaw and

managed the TLC Study at the Baltimore City Clinical Center. The TLC Study was designed to study methods of addressing the high incidence of lead poisoning in inner cities. The TLC Study involved two components: (1) to evaluate the effects of the oral chelating agent, succimer,[1] on moderately lead poisoned children; and (2) to evaluate benefits of residential lead clean-up and nutritional supplementation for these children. For present purposes, there were two criteria for a child to be eligible to participate in the TLC Study: (1) the child, aged between 12 and 32 months, had to have a moderate existing blood lead level (between 20 and 44 micrograms per deciliter);[2] and (2) the child had to reside in a home that was structurally sound and capable of being cleaned. The children were referred to the study by their pediatricians, or because they were already participating in the KKI Lead Clinic, which operated separately from the TLC Study. Prior to a child's participation in the TLC Study, KKI required parents[3] to give informed consent to participation both during pre-enrollment screening and at the enrollment stage.

Once a child was referred to the TLC Study, a KKI investigator would review the TLC Study pre-enrollment informed consent form ("pre-enrollment consent form") with

---

[1] Succimer belongs to a family of drugs called "chelators" that bind to toxic metals such as lead in the bloodstream, and allow the body to expel the resulting compound through the urinary system. Succimer is regularly used to treat children with high blood lead levels. Chelation: Therapy or "Therapy"?, National Capital Poison Center, <http://perma.cc/FK5K-2TXK> (last visited Nov. 21, 2014).

[2] Blood lead levels are measured in micrograms per deciliter, which are abbreviated as mcg/dL. *See Ross v. Housing Authority of Baltimore City*, 430 Md. 648, 653 n.4 (2013).

[3] For ease of reference, we use the term parents to also include guardians.

the parents of the eligible child.  The relevant sections of the pre-enrollment consent form are as follows:

Your child has been exposed to a moderate amount of lead. . . We do not know if giving a child medicine to get rid of some of the lead in her/his body will keep the lead from harming her/him. . . .

* * *

Your child may be eligible for our study. . . We want to see whether a medicine prevents lead in children's bodies from harming them as they grow older.  This medicine is called succimer, and it gets rid of some of the lead in children's bodies.  It is now used for children who have more lead in their bodies than your child has.

All children in the TLC Study will have their homes repaired and/or cleaned to get rid of lead dust and chipped paint.  We will take a careful look at your home to see if it can be repaired and/or cleaned to reduce lead paint and dust hazards.  The person that takes a look at your house may collect dust samples from your home to check for lead.  All children will get vitamins and minerals, will get regular checkups and blood tests from a doctor, and will get tests of their thinking, learning and development. . . .

* * *

Every child will be in [the placebo] group or the [succimer group].  Unless there is a problem, you and the TLC doctor who takes care of your child will never know which group your child is in.  There will be another doctor at the hospital who does know your child's group in case of problems.

The pre-enrollment consent also described what the pre-enrollment process entailed:

**1. Clinic visits and blood tests**: Today we will do a blood test and check up of your child. . . We will measure the amount of lead [to determine eligibility]. . . .

-3-

Specifically, the pre-enrollment consent forms explained how KKI would conduct an initial assessment of the child's home at the pre-enrollment stage as part of the environmental component.

> **2. Home visits and Cleanup:** Trained workers will come to your home to look at painted surfaces, including porches, walls, floors, windows and trim; this is to find out whether your house can be cleaned or repaired to reduce lead hazards in paint and dust. . . .
>
> Some houses will qualify straightaway based on condition. If repairs are needed to qualify your house, the owner or landlord must give his/her permission for the repairs, with our help apply for a state loan and be approved for the loan for special repair funds. If your house does not qualify at all, the person checking your home will explain why and provide further information on "lead safe" housing. . . .
>
> * * *
>
> **3. Vitamins and minerals:** We will give you vitamins with minerals tablets[.]

If KKI determined that a child was eligible for the study, the pre-enrollment consent form explained that KKI would arrange for trained workers to return to the child's house and "[v]acuum and wet-wash floors, window sills, window wells and other surfaces . . . to remove as much lead dust and loose chips of paint as possible, [m]ake some repairs, if the owner has special approval for a loan, [and p]rovide you with information on how you can reduce lead exposure in the home." Assessment guidelines were governed by the TLC Protocol. KKI used the same standardized home assessment forms that were used at all Clinical Centers. Depending on the results of the assessment, the home was either professionally cleaned to remove existing lead dust and paint chips, or parents were

provided with information on relocating to "lead safe" housing.[4]  After the cleaning and

repairs, KKI provided parents with cleaning supplies and instructions on how to further

reduce lead exposure in the home.

Upon completion of the pre-enrollment screening stage, KKI representatives would

then provide parents with the TLC Study enrollment informed consent form ("enrollment

consent form") to complete the child's enrollment in the study.  For our purposes, the

relevant portions are set out below.

> **2. Blood lead results:**  You and the TLC doctor taking care of your child will not know the results of the blood lead tests done during the first six months after your child starts taking capsules, but another doctor will know in case there is a problem. . . You may have the blood lead results after these treatment periods if you want them. . . .

> \* \* \*

> **5.  Damage at home or moving to a different home:** It is important for you to tell us if you move, or if a plumbing leak or anything else damages the walls or ceilings in your home, because we will need to come out and inspect and clean up as we did at the beginning of the study.  If the doctor who sees the results of the blood lead tests finds that the amount of lead in your child's blood has gone up too much, we may want to come and inspect or clean your home again.  Very rarely, a child's blood lead level might go up so high during the study that they might receive additional treatment outside of the study.

The enrollment consent form also highlighted the various benefits that KKI expected all

children participating in the TLC Study to receive.  Specifically, KKI told parents that it

---

[4]      Neither the TLC Study Protocol, nor any of the informed consent documents included a definition of the term "lead safe."  *See infra* n.20.

would inspect the home for the presence of lead dust and chipped paint, "clean-up the lead dust in your home," provide the child with vitamins and minerals, provide regular medical check-ups for the child, check the child's blood lead levels "regularly and carefully," and test the child's thinking and development.

In the medical treatment component of the study, KKI sought to determine whether succimer, which had previously been used only for children with extremely elevated blood lead levels (in excess of 44 mcg/dL), could also be used to treat children with moderately elevated blood lead levels between 20 and 44 mcg/dL. All study participants received one to three rounds of either succimer or the placebo during the six-month treatment period, and their blood lead levels were measured two weeks after every round of treatment. The entire study period lasted three years. After completion of the six-month treatment period, participants continued to receive vitamins and mineral supplements, regular medical check-ups, blood testing, and various cognitive tests for the remainder of the study.

The medical treatment component of the TLC Study was "double blind," meaning that neither KKI nor the parents of the children knew whether the child was given the placebo or the succimer until the completion of the treatment period. To maintain the double blind nature of the TLC Study, blood test results were reviewed by a separate physician who did not have any contact with the parents during the treatment period. That physician did not report the results to KKI, but rather to the central TLC Data Coordinating Center run by the Harvard School of Public Health in Boston.

If, after the first round of succimer treatment, a participant child's blood lead level remained above 15 mcg/dL, the Data Coordinating Center was required to advise KKI to

conduct a retreatment for both placebo and succimer recipients (to maintain the double blind nature of the study). According to the TLC Study Protocol, there were two circumstances where the Data Coordinating Center was required to notify KKI of an individual child's blood test result. First, if the child's blood lead level was 45 mcg/dL or higher, the Data Coordinating Center was required to direct KKI to retest the child's blood within three days. If the child's blood lead level measured 45 mcg/dL or higher after the retesting, the child's participation in the TLC Study treatment would have paused, and the child would have been treated in accordance with KKI's normal protocol for children with lead levels above 44 mcg/dL, including succimer treatment. Second, if the child's blood lead level measured above 60 mcg/dL, participation in the TLC Study would have ended immediately and the child would have been treated according to KKI's treatment protocols for children with lead levels above 60 mcg/dL.

Ultimately, in 2001 the results of the TLC study were published. The researchers found that:

> Treatment with succimer lowered blood lead levels but did not improve scores on tests of cognition, behavior, or neuropsychological function in children with blood lead levels below 45 mg per deciliter. [Because] succimer is as effective as any lead chelator currently available, chelation therapy is not indicated for children with these blood lead levels.

Walter J. Rogan, MD et al., *The Effect of Chelation Therapy with Succimer on Neuropsychological Development in Children Exposed to Lead*, 344 New Eng. J. Med. No. 19, 1421 (2001). The researchers ultimately concluded that because "lead poisoning [is]

entirely preventable, our inability to demonstrate effective treatment lends further impetus to efforts to protect children from exposure to lead in the first place." *Id*. at 1426.

## II.    Tyron White

Appellant Tyron White ("White") was two years old when a blood test revealed that he had a blood lead level of 43 mcg/dL. His physician at East Baltimore Medical Center then referred White's mother, Carolyn Riddick, to the TLC Study. In August of 1995, Ms. Riddick met with KKI research investigator, Dr. Cecilia Davoli, who reviewed the pre-enrollment consent form with Ms. Riddick and explained the objectives and the process of the study. Ms. Riddick signed the pre-enrollment consent form and KKI performed another blood test to verify White's blood lead levels. The test revealed that his blood lead levels had increased to 47 mcg/dL, which was too elevated for White to be eligible for the study.

After receiving the test results, Ms. Riddick scheduled White for another pre-enrollment visit that was conducted on August 21, 1995. At that time, Ms. Riddick signed another pre-enrollment consent form that was identical to the first. White was retested and his blood lead level measured 39 mcg/dL, which was within the TLC Study eligibility range. White's rental home at 1107 Gorsuch Avenue was then inspected by KKI on August 23, 1995, but it was determined not to be cleanable because of its poor condition and high levels of lead contamination. As a result, White remained ineligible for the TLC study.

Ms. Riddick relocated to 3215 Tinges Lane in October of 1995. She contacted KKI and a KKI inspector determined the new property to be cleanable. At this point, White was eligible for enrollment in the TLC Study. Ms. Riddick signed the enrollment consent form

on October 3, 1995, thus completing White's enrollment. KKI hired a contractor to perform a "lead clean" of the Tinges Lane property shortly thereafter.

In January of 1996, only four months later, Ms. Riddick decided to move again. She testified at trial that a KKI social worker not involved with the TLC Study, Kristy Council, provided her with a list of "lead safe" properties and drove Ms. Riddick around to view the homes. From the list provided, Ms. Riddick selected a property at 642 Gorsuch Avenue. Ms. Council assisted Ms. Riddick to obtain $375 to pay for the security deposit.

A KKI inspector looked at the Gorsuch property in February 1996 and determined that it qualified for TLC Study purposes. KKI hired a contractor to perform a "lead clean" of the 642 Gorsuch Avenue property in April of 1996. According to KKI records, lead dust sampling conducted by KKI before and after the professional cleaning revealed that after the professional cleaning, lead dust levels actually increased in four of the seven sampled areas.[5] In June of 1996, White's blood lead level was 29 mcg/dL, which was nine points higher than when he first moved into the 642 Gorsuch Avenue property, but lower than when he first entered the TLC Study.[6] At the time these measurements were taken,

---

[5] It is not explained in the record why cleaning the property resulted in increased lead levels.

[6] The measurements were provided by the TLC Data Coordinating Center in response to a discovery request made in this case, but were not provided to Ms. Riddick prior to the commencement of litigation. Thus, because White's blood lead levels did not go above 44 mcg/dL, and due to the double blind nature of the study, neither KKI nor Ms. Riddick were informed of White's blood lead level fluctuations during his participation in the TLC Study.

White was still in the double blind treatment period of the TLC Study. White remained at the Gorsuch property until July 1996.

On July 13, 2011, White filed suit against numerous defendants, including KKI, alleging that he suffered significant brain injury as a result of toxic lead exposure. In his complaint against KKI, White alleged that he suffered toxic lead exposure resulting from KKI's tortious design and implementation of the TLC Study. In Counts 40-42, White alleged that KKI negligently and intentionally misrepresented the lead-based paint hazards in his home during the time that he was in the TLC Study, as well as the risk of harm to White as a result of participating in the study. In Count 43, White also alleged that KKI was negligent in failing to properly review and oversee the TLC Study. Lastly, in Count 44, White alleged that KKI is liable under the Maryland Consumer Protection Act ("CPA") for misrepresentations made when assisting Ms. Riddick to find "lead safe" housing.

The trial court granted judgment in favor of KKI pursuant to Md. Rule 2-519 at the close of plaintiff's case in White's claims of negligent and intentional misrepresentation (Counts 40-42), and violation of the CPA (Count 44). The only issue presented to the jury was whether KKI negligently failed to properly review and oversee the TLC Study. On April 29, 2014, after a lengthy trial, the jury returned a verdict in favor of KKI, finding that KKI did not act negligently in planning and implementing the TLC Study. This appeal followed.

**DISCUSSION**

## I. Background

Although lead paint cases are not new to Maryland courts, this case is rather unique in light of White's claims against KKI and, as a result, his heavy reliance on the Court of Appeals's decision in *Grimes v. Kennedy Krieger Institute*, 366 Md. 29 (2001), to inform much of his argument. To our knowledge, the applicability of the *Grimes* decision has not been revisited in depth by a Maryland court since the Court of Appeals denied reconsideration of its *Grimes* decision in October 2001. Because of the central role that the *Grimes* opinion plays in the case at hand, we begin our discussion with an in-depth look at the facts of that case and the conclusions reached by the Court of Appeals.

The facts giving rise to the *Grimes* litigation arose from another research study facilitated by KKI in the 1990s − the Evaluation of Efficacy of Residential Lead Based Paint Repair and Maintenance Interventions, ("R&M Study") − that sought to test the effectiveness of varying levels of lead abatement procedures in rental housing units in Baltimore City. *Grimes*, 366 Md. at 36. The R&M Study aimed to find cheap, yet effective, environmental lead clean-up interventions that would still protect children but be economically feasible for landlords of low income rental housing units. *Id.* at 51.

The R&M Study consisted of five test groups of homes with varying levels of lead and lead intervention. *Id*. at 50. Groups 1 through 3 were homes with known lead paint contamination that received different levels of repair and maintenance. *Id*. at 53. Group 4 consisted of fully abated homes that required no additional repair or maintenance, and Group 5 homes were constructed after 1980 and did not have any lead paint. *Id*. at 54.

To measure the success of the various abatement levels, KKI needed families with young children to live in the R&M Study homes, and consent to routine blood lead level tests for their small children for a period of two years. *Id*. at 37, 49-50. In some instances, KKI helped landlords receive federal funding for the abatements, and then encouraged or required the landlords to rent partially abated homes to families with young, otherwise healthy children. *Id.* at 36-37. "It was anticipated that the children, who were the human subjects in the program, would, or at least might, accumulate lead in their blood from the dust, thus helping the researchers to determine the extent to which the various partial abatement methods worked." *Id*. at 38. In short, on the facts before the Court of Appeals,[7] the R&M Study actively recruited healthy children to move into and reside in housing with known lead contamination risks, and measured the effectiveness of abatement procedures by the extent to which the children's blood levels became contaminated with lead. Placing healthy children in environments where KKI knew that the children could face the risk of lead poisoning prompted an outraged and angry response from the Court, which compared the R&M Study to the Tuskegee Syphilis Study, as well as other notorious human experiments such as:

> . . . the deliberate use of infection in a nontherapeutic project . . . to study the degree of infection and the rapidity of the course of the disease in the Rose and Mrugowsky typhus experiments at Buchenwald concentration camp during World War II. These programs were somewhat alike in the vulnerability of the subjects; uneducated African–American men,

---

[7] The Court of Appeals noted that the facts on the record were "not extensive" because the case came on appeal from a grant of a pre-trial motion for summary judgment. *Grimes*, 366 Md. at 50 n.12.

> debilitated patients in a charity hospital, prisoners of war, inmates of concentration camps and others falling within the custody and control of the agencies conducting or approving the experiments. In the present case, children, especially young children, living in lower economic circumstances, albeit not as vulnerable as the other examples, are nonetheless, vulnerable as well.

*Id*. at 44-45. The Court of Appeals concluded that the rights of each individual child unknowingly subjected to dangerous conditions outweighs any interests of the researcher in promoting the public good. *Id*. at 104.

The Court of Appeals in *Grimes* was particularly outraged by what it understood to be KKI's failure to warn parents of the risks of participating in the R&M Study both at the informed consent stage, and as risks became known or foreseeable during the study. *Id*. at 99. The consent forms signed by the parents did not explain that the success of the various levels of abatement was to be measured, in part, by the extent to which their children's blood was contaminated with lead. *Id*. at 38. Additionally, KKI failed to warn parents during the study that their children's blood lead levels were increasing. In the case of Ericka Grimes, appellant and one of the child subjects, KKI tested her home for the presence of lead after performing a partial abatement. *Id*. at 58. However, KKI did not reveal the results of the test that identified several lead "hot spots" until nine months later, after Ericka Grimes had already been lead poisoned. *Id*. at 59.

The central legal question addressed by the Court of Appeals was what duty of care a researcher owes to the study participants. The Court specifically limited its holding to a nontherapeutic research study, which it defined as one that "generally utilizes subjects who are not known to have the condition the objectives of the research are designed to address

. . . [and] is not designed to directly benefit the subjects utilized in the research, but, rather. . . the public at large." *Id*. at 36 n.2. In addressing the scope of the researcher's duty to research subjects in such a nontherapeutic study, the Court of Appeals in *Grimes* reached several conclusions:

> We hold that in Maryland a parent, appropriate relative, or other applicable surrogate, cannot consent to the participation of a child or other person under legal disability in nontherapeutic research or studies in which there is any risk of injury or damage to the health of the subject.

> We hold that informed consent agreements in nontherapeutic research projects . . . can, as a matter of law, constitute "special relationships" giving rise to duties, out of the breach of which negligence actions may arise. We also hold that, normally, such special relationships are created between researchers and the human subjects used by the researchers. Additionally, we hold that governmental regulations can create duties on the part of researchers towards human subjects out of which "special relationships" can arise. . . .

> The determination as to whether a "special relationship" actually exists is to be done on a case by case basis. The determination as to whether a special relationship exists, if properly pled, lies with the trier of fact.

*Id*. at 113-14. The Court of Appeals reversed the trial court's grant of summary judgment and remanded based on the grounds that there were material facts in dispute as to whether a special relationship existed which would have imposed certain duties on KKI. *Id*. at 48.

Judge Irma Raker concurred in the result only. Judge Raker criticized the "mixed message" sent by the *Grimes* majority "as to whether the existence of a tort duty arising from a special relationship existed is a question of law for the court or a question to be determined by the trier of fact." *Id*. at 115-16. Specifically, Judge Raker highlighted the

-14-

following two self-contradictory pronouncements of the Court: (1) "We hold that informed consent agreements in nontherapeutic research projects . . . can, as a matter of law [as determined by the trial judge], constitute 'special relationships' giving rise to duties;" and (2) "The determination as to whether a special relationship exists, if properly pled, lies with the trier of fact [in this case, the jury]." *Id*. at 113-114.  The majority did not clarify this aspect of the decision in response to Judge Raker's criticism.

After the *Grimes* opinion was issued, KKI filed a motion for reconsideration, which was supported by a joint amicus brief from the Association of American Medical Colleges, the Association of American Universities, the University of Maryland Medical System, and Johns Hopkins University.  Appellee's Br. in Supp. of Mot. to Recons., *Grimes*, 366 Md. 29 (2001), *recons. denied* (Oct. 11, 2001),  *available at* <http://perma.cc/WJ82-9NHV>; Br. of Amici Curiae Assoc. of Am. Med. Coll., Ass'n of Am. Univ., Johns Hopkins Univ., and Univ. of Md. Med. Sys. Corp. in Supp. of Appellee's Mot. for Recons., *Grimes*, 366 Md. 29 (2001) *recons. denied* (Oct. 11, 2001),  *available at* <http://perma.cc/ET6Z-GUVQ >.  The research community was concerned that the *Grimes* decision would effectively prohibit any research involving children even if the research institution complied with all applicable federal regulations regarding research using children.  *Id.*; Anna C. Mastoianni and Jeffrey P. Kahn, *Risk and Responsibility: Ethics, Grimes v. Kennedy Krieger, and Public Health Research Involving Children*, 92 Am. J. Pub. Health 1073, 1074 (Jul. 2002).  This concern stemmed from the *Grimes* majority's apparent conclusion "that parents in the state of Maryland could not consent to their minor children's participation in research that posed even a minimal risk of harm if it offered no

prospect of direct medical benefit to the subjects." *Id*. at 1073. Critics noted that "[this] statement, which the Court referred to as a holding, was also puzzling because the issue was raised by the Court rather than at the request of the parties." Diane D. Hoffmann & Karen H. Rothenburg, *Whose Duty is it Anyway?: The Kennedy Krieger Opinion and its Implications for Public Health Research*, 6 J. Health Care L. & Pol'y 109, 109-10 (2002) [hereinafter, "Whose Duty is it Anyway?"].

Two months after issuing the opinion in *Grimes*, and in light of the various concerns raised on reconsideration, the Court of Appeals denied the motion, albeit with a large caveat. In denying the motion, the *Grimes* Court claimed that "the only conclusion that we reached as a matter of law was that, on the record currently before us, summary judgment was improperly granted." *Grimes*, 366 Md. at 119. Further, the Court clarified:

> [B]y "any risk," we meant any articulable risk beyond the minimal kind of risk that is inherent in any endeavor. The context of this statement was a non-therapeutic study that promises no medical benefit to the child whatever, so that any balance between risk and benefit is necessarily negative. As we indicated, the determination of whether the study in question offered some benefit, and therefore could be regarded as therapeutic in nature, or involved more than that minimal risk is open for further factual development on remand.

*Grimes* at 120. Judge Raker dissented from the denial of the motion for reconsideration both restating the concerns she raised in her original concurring opinion, as well as noting

-16-

her opposition to the majority's "declaration[s] of public policy that, in the posture of this case, are best left to the General Assembly."  *Id.*[8]

[8] Criticism of *Grimes* has not abated with the decision on reconsideration.  Many have criticized *Grimes*' hostility to medical research, imputation of conflicts of interest to institutional review boards, and inflammatory tenor.  *See, e.g.,* Jack Schwartz, *The Kennedy Krieger Case: Judicial Anger and the Research Enterprise*, 6 J. Health Care L. & Pol'y 148 (2002) (referring to the *Grimes* majority opinion as "a well-intended but flawed critique of pediatric research ethics. . . . The Court's rhetoric was heated, its historical comparisons inflammatory and unjust, and aspects of its decision ill-considered.").

One common critique is with the *Grimes* Court's characterization of the R&M Study as not being designed to benefit the study participants:

> Contrary to statements made by the [C]ourt of [A]ppeals judges and others, however, the KKI research cannot be properly characterized as "a non-therapeutic study that promises no medical benefit to the child whatever." Because the participants stood to benefit directly by an environmental intervention hypothesized to effect reduced blood lead levels, the [C]ourt's assertion reflects a deep misunderstanding of the nature of public health research. Unlike nontherapeutic research designed solely for the sake of advancing medical science, there can be no question that an outcome intrinsic to the KKI research design was the projected benefit to the research participants of lower blood lead levels.

David R. Buchanan & Franklin G. Miller, *Justice and Fairness in the Kennedy Krieger Institute Lead Paint Study: the Ethics of Public Health Research on Less Expensive, Less Effective Intervention*, 96 Am. J. Pub. Health 781, 785 (May 2006).

Another frequently noted criticism is that, despite the Court of Appeals's efforts to clarify its original opinion, the medical research community remains unsure whether the clarification on the motion for reconsideration brought the majority opinion within the already existing federal guidelines on medical research studies, or if it stands for a more strict standard than required by federal law.  Loretta M. Kopelman, *Pediatric Research Regulations Under Legal Scrutiny:* Grimes *Narrows Their Interpretation*, J. Law, Med. & Ethics 38, 41 (2002). ("From one point of view, *Grimes* and the federal regulations are entirely compatible, *Grimes* could be understood as focusing narrowly on the issue of negligence. . . . From another point of view, *Grimes* seemed to be a broadside assault on

In light of the Court of Appeals's pointed effort to specifically limit its holding, we are constrained to hold fast to the narrow parameters set out by the Court of Appeals in its denial of the motion for reconsideration.  With this understanding of *Grimes* in mind, we now address the three issues raised by White on appeal.

## II.    Jury Instructions

The first issue that we address is whether the trial court erred by refusing to provide White's requested jury instructions.  White asked the trial court to instruct the jury on two issues regarding KKI's duty of care: (1) the duty of care imposed by the execution of a consent form in a research study under *Grimes*; and (2) on the evidence of negligence arising from the violation of federal regulations.  Regarding the former, White frames his

---

investigators' customary practices"); Roger L. Jansson, *Researcher Liability for Negligence in Human Subject Research: Informed Consent and Researcher Malpractice Actions*, 78 Wash. L. Rev. 229, 230 (2003) ("It remains unclear whether this definition sets a higher standard of care than the federal regulations, or merely interprets allowable risk under the regulations.").

Additionally, critics have noted that:

> If, in fact, the [*Grimes*] Court's decision stifles public health research, society will suffer because we will not have the data on which to base needed public health reforms.  Moreover, individuals who are harmed as a result of exposure to noxious substances in the environment or in their homes . . . may suffer as well.  Without the public health and epidemiological data generated by research studies individuals will be unable to prove causation and will not be compensated for their injuries.

Diane D. Hoffmann & Karen H. Rothenburg, *Whose Duty is it Anyway, supra* at 16 at 111. Despite all of these criticisms, *Grimes* remains the law of Maryland and we are duty-bound to follow its holding as clarified by the supplemental opinion issued in response to the motion for reconsideration.  *Grimes*, 366 Md. at 120.

argument in large part using *dicta* from *Grimes*, and asks us to find that Court of Appeals's

discussion of a researcher's duty to the research subject in *Grimes* is both the applicable

law in Maryland, and applicable to the facts of this case, thereby mandating that the trial

court provide his requested jury instruction. The latter are based on the federal regulations

pertaining to informed consent in research studies. For the reasons that follow, we affirm

the ruling of the trial court and hold that the jury instructions requested by White were not

compelled.

There are "three components that must be met to include a proposed jury instruction

in the ultimate charge to the jury: '(1) the instruction is a correct statement of law; (2) the

instruction is applicable to the facts of the case; and (3) the content of the instruction was

not fairly covered elsewhere in instructions actually given.'" *Wood v. State*, 436 Md. 276,

293 (2013) (quoting *Dickey v. State*, 404 Md. 187, 197-98 (2008)); *see also Gunning v.*

*State*, 347 Md. 332, 348 (1997) (same). We review the denial of a proposed jury instruction

under the highly deferential abuse of discretion standard, and we will hold that the trial

court was within its discretion to exclude all of White's proposed instructions. *See id*. at

292.

### 1. *Proposed Instruction Based on* Grimes

Proposed instruction 36 dealt with the duty owed by a researcher to a subject under

*Grimes*, in particular the duty of the researcher to warn of known and foreseeable risks.

White requested that KKI's duty be described as the following:

> By having [Plaintiff's mother] sign the Consent Form, both
> KKI and [Plaintiff's mother] made representations, which
> created a bilateral contract between the parties. At the very

least, [it suggests that Plaintiff's mother would be] informed of all the information necessary for the subject to freely choose whether to participate, and continue to participate, and receive promptly any information that might bear on their willingness to continue to participate in the study. This includes full, detailed, prompt, and continuing warnings as to all the potential risks and hazards inherent in the research or that arise during the research. . . . Researcher/subject consent in nontherapeutic research can, and in this case did, create a contract.

White argues that proposed instruction 36 was necessary to adequately explain to the jury the scope of the researcher's duties under *Grimes*.

In denying White's instructions on the duty of care owed under *Grimes*, the trial court stated, "I'm willing to describe the duty, as *Grimes* sets forth in here, based on their special relationship as researcher and study participant. I'm just not willing to define that duty, and I don't think *Grimes* does either, based on - - based on what's in the consent form." Instead, the jury instructions given at trial were:

Now, in order to establish a claim of negligence, the plaintiff in this case must prove four elements:

First, that the defendant, Kennedy Krieger Institute, was under a duty to protect the plaintiff from injury; two, that the defendant breached that duty; three, that the plaintiffs suffered actual injury or loss; and, four, that the loss or injury was caused by the defendant's breach of the duty.

Now, scientific researchers and research entities owe a duty of care to participants in scientific research studies. This duty requires the protection of the study participants from unreasonable harm and requires the researcher to completely and promptly inform the participants of potential hazards existing during the study.

If you find that the plaintiff was a study participant in scientific research by Kennedy Krieger Institute, then you must

-20-

find that Kennedy Krieger owed a duty of care to the plaintiff as I have just described.

Now, negligence is doing something that a person using reasonable care would not do, or not doing something that a person using reasonable care would do. Reasonable care means that caution, attention, or skill a reasonable person would use under similar circumstances.

The trial court also provided the same instructions to the jury by way of a typewritten verdict sheet. The jury specifically concluded that although Kennedy Krieger owed a duty to White, there was no breach of that duty.

As described above, we must determine whether White's proposed *Grimes* instruction was a correct statement of law, applicable to the facts of the case, and not otherwise fairly covered by the given instructions. *Wood*, 436 Md. at 293. For the reasons that follow, we conclude that the trial court did not abuse its discretion by refusing to provide White's requested jury instruction.

We begin our analysis by discussing whether the instruction was a correct statement of the law. As we stated above in our discussion of *Grimes*, the only enduring holding in that case was that on the facts of the case before it, the trial court's grant of summary judgment was inappropriate. *Grimes*, 366 Md. at 119. The Court of Appeals remanded for further factual development on all issues pertaining to liability and damages. *Id*. While *Grimes* is useful in "attempting to address" the potential issues raised in the context of a nontherapeutic research setting "in a full and exhaustive manner," the Court did not set forth absolute and determinate standards regarding the creation of a special relationship or the duty owed by a researcher to the subject. *Id*. at 119. We, therefore, disagree with

-21-

White's assertion that proposed instruction 36 accurately reflected the state of the law in Maryland because *Grimes* does not set a specific standard.

Even if we were to incorporate the pre-reconsideration "holdings" of the *Grimes* Court, White's proposed instruction 36 was still not required by law because *Grimes* did not definitively specify the scope of a researcher's duty. The duty to warn identified by White in his proposed instruction 36 is discussed by the principal *Grimes* opinion in *dicta*, and within the limited context of a factual finding that a special duty may be created when a researcher is in a superior position to identify risks. To this point, the *Grimes* court explained:

> A special relationship giving rise to duties, the breach of which might constitute negligence, *might also arise* because generally, the investigators are in a better position to anticipate, discover, and understand the potential risks to the health of their subjects. . . .
>
> This duty requires the protection of the research subjects from unreasonable harm and requires the researcher to completely and promptly inform the subjects of potential hazards existing from time to time.

*Grimes,* 366 Md. at 102 (emphasis supplied). Thus, at most, pre-reconsideration *Grimes* stood for the proposition that in certain circumstances, a duty *may* exist between the researcher and research subject. In the context of a special relationship resulting from the execution of an informed consent agreement (the context in which White frames his proposed jury instruction), *Grimes* did not define the scope of the duties owed by the researcher. *Id*. at 113. Instead, the *Grimes* majority found generally that under such circumstances, a special relationship may exist "giving rise to duties, out of the breach of

which a negligence action may arise." *Id*. Therefore, even considering the prior holdings and *dicta* of *Grimes*, White's proposed jury instruction 36 misses the mark because the duty he identifies – to provide full, detailed, prompt, and continuing warnings − is contingent on the factual finding of the existence of a special relationship arising from the researcher's superior position of knowledge. The duty identified by White is not, as he asserts, a broad, over-arching duty that automatically attaches; rather, it only arises in a limited context. For this reason, White's proposed instruction does not accurately reflect the law, and is therefore not required under the first prong of the *Wood* analysis.

Moreover, under the second prong of the *Wood* analysis, proposed instruction 36 was not required by the facts of the case. We conclude that the benefits provided by KKI to all research participants in the TLC Study are sufficient to remove the TLC Study from the purview of *Grimes*. In *Grimes*, the Court addressed the potential existence of a special relationship in the limited context of a nontherapeutic research study "that promises no medical benefit to the child whatsoever." *Grimes*, 366 Md. at 120. The particular situation addressed by *Grimes* involved "researchers recruit[ing] people, especially children whose consent is furnished indirectly, to participate in nontherapeutic procedures that are potentially hazardous, dangerous, or deleterious to their health." *Grimes* 366 Md. at 93. Further, "the creation of study conditions or protocols or participation in the recruitment of otherwise healthy subjects to interact with already existing, or potentially existing, hazardous conditions, or both, for the purpose of creating statistics from which scientific hypotheses can be supported" was found by the Court to normally create a special relationship as a matter of law. *Id*. at 93. To the extent that *Grimes* set forth the law, it set

forth law in the factual context of nontherapeutic research. It does not apply except indirectly in the context of therapeutic research.[9]

We hold that the TLC Study at issue in this case was a therapeutic rather than nontherapeutic study. We come to this conclusion in large part because the TLC Study sought "to directly help or aid a patient who is suffering from a health condition the objectives of the research are designed to address." *Grimes*, 366 Md. at 36 n.2 (comparing and contrasting therapeutic and nontherapeutic research studies). Although White's counsel characterizes the TLC Study as nontherapeutic, he does not dispute the underlying facts that demonstrated that it was therapeutic, thus distinguishing the TLC Study from the R&M Study.

*First,* while the R&M Study took otherwise healthy children and placed them in potentially hazardous conditions, the TLC Study recruited only children who already exhibited elevated blood lead levels. In *Grimes*, "[i]t was anticipated that the children . . . would, or at least might, accumulate lead in their blood from the dust, thus helping the researchers to determine the extent to which the various partial abatement methods worked." *Grimes* 366 Md. at 38. In contrast, in the TLC Study, KKI either cleaned homes in which the children were already living, or provided them with information on how to

_____

[9] It seems clear that now, and for quite some time, the medical ethics community has not used the terminology of a therapeutic/nontherapeutic dichotomy. Robert J. Levine, *Clarifying the Concepts of Research Ethics*, Hastings Center Report, June 1979, at 23. ("In all subsequent reports, the [National] Commission [for the Protection of Human Subjects of Biomedical and Behavioral Research] completely abandoned the language of therapeutic and nontherapeutic research and used instead the concept of nonvalidated practices.") Nonetheless, we must work within the therapeutic/nontherapeutic framework laid out in *Grimes*.

-24-

relocate to safer housing. No research subjects in the TLC Study were placed in more harmful conditions than they were already experiencing.

*Second*, one of the main goals of the TLC Study was to reduce every participant's further exposure to lead, and every participating child was provided with a number of benefits designed to improve health and reduce the effects of existing elevated blood lead levels. All participating children received vitamin and mineral supplements, regular medical check-ups, their homes were professionally cleaned, their parents were taught how to further reduce lead exposure in the home through regular cleaning, and their parents were provided with special cleaning materials and cleaning instructions to further reduce lead dust exposures.[10] The environmental component of the TLC Study was designed to limit the participant's exposure to lead in the home for at least six months and up to three years. As agreed to by both parties to varying degree, cognitive damage from lead exposure occurs during the early years of childhood, and exposure to lead in the home is one of the primary sources of lead contamination. KKI's efforts to reduce the child participant's exposure to lead during the timeframe that a child is most vulnerable to the negative effects of lead further served as an intended benefit to all participants.

*Third*, in counter-distinction to the R&M Study, we note that under the TLC Study Protocol, if blood tests revealed that a child's blood lead level had increased beyond

---

[10] The only aspect of the TLC Study that was arguably nontherapeutic was the administration of placebos rather than succimer to a control group of child subjects. For those children, the medical aspect of the TLC Study offered no prospect for therapeutic benefit and could thus be characterized as nontherapeutic. White, however, has specifically waived any claims based on the medical aspect of the TLC Study.

44 mcg/dL, parents would be notified and KKI would begin individualized treatment of the child. Participants in the TLC Study would benefit from the early detection of severely elevated blood lead levels resulting from their increased access to medical screenings.

For all of these reasons, we hold that the TLC Study is different from the R&M Study in meaningful ways that make it a therapeutic study, thereby taking it out of the factual scope of *Grimes*. Therefore, White's requested jury instruction under *Grimes* is not factually applicable in the present context of a therapeutic study.

White's proposed instruction 36 is also factually inapplicable to the TLC Study because the researchers in the TLC Study lacked the special knowledge that *Grimes* explained may give rise to special duties. Even if White's proposed instruction 36 properly reflected the holding of the *Grimes* Court (that a special relationship may be created by the researcher's special knowledge that in turn gives rise to a duty to warn), it would still fail on the facts of the TLC Study. In *Grimes*, the special knowledge that the researchers had − but that the parents lacked − was knowledge of the child subjects' elevated blood lead levels. Here, however, the TLC Study was double blind, and pursuant to the TLC Study Protocol, KKI was not notified of the results of an individual child's blood lead levels unless the child's blood lead level went above 44 mcg/dL.[11] At any point that a child's lead levels were confirmed to be higher than 44 mcg/dL during the TLC Study, KKI was

_____

[11] Under White's theory, as elaborated at oral argument before this Court, all double blind research studies that involve children are inherently illegal. This theory would require us to foreclose a major line of scientific inquiry; it would preclude all double blind studies, even if they are designed with sufficient safety protocols and benefits to the participant. We do not find that to be required by *Grimes*, nor on the facts of this case.

required to notify the parent, end the child's participation in the TLC Study, and begin treating the child according to KKI's standard procedure for treating children with blood lead levels above 44 mcg/dL. Prior to a child's blood lead level reaching above 44 mcg/dL, KKI was not notified of fluctuations in blood lead levels, and therefore could not pass along that information to the parents. Thus, the TLC Study Protocol by design prevented KKI from having the specific knowledge of a child's elevated lead levels that in *Grimes* were found to, at times, give rise to special duties.

Proposed instruction 36 was also covered, although imperfectly, by the negligence instruction provided by the trial court in satisfaction of the third prong of the *Wood* analysis. In fact, the trial court instructed the jury that if they found that White was a participant in a human research study, they *must* find that KKI owed White a duty. In our opinion, this goes beyond *Grimes*' pronouncement that a duty *may* arise in such circumstances where the researcher has a superior knowledge of the risks of the study. Therefore, the instructions actually provided were more beneficial to White than that required by the law. Moreover, the jury specifically found that KKI owed White a duty. Thus, there was no harm caused by the allegedly defective instruction. We affirm the trial court's refusal to give White's proposed instruction 36 to the jury.

### 2. Proposed Instructions Based on Federal Regulations

Proposed instructions 33-33D pertained to guidelines for adequate informed consent under federal law, particularly the Federal Food Drug and Cosmetic Act, 21 CFR § 50 *et seq*. White argues that the federal regulations pertaining to the adequacy of informed consent are relevant because, under *Grimes*, the informed consent process is the source of

-27-

the duty of care owed to the research subject. *See Grimes*, 366 Md. at 113. ("[I]nformed consent agreements in nontherapeutic research projects, under certain circumstances can constitute contracts; . . . that, under certain circumstances . . . can, as a matter of law, constitute 'special relationships' giving rise to duties."). Therefore, White argues that any breach of the federal regulations regarding informed consent is evidence of a breach of that duty.

The trial court rejected White's proposed federal regulation instructions 33-33D primarily on the ground that they were inapplicable to the remaining negligence claim being presented to the jury. Because the only count that went to the jury was whether KKI negligently oversaw the TLC study, the trial court asked "what is the duty of the researcher towards [the subject] while they're study participants[?] . . . Because that's what we have . . . I mean the consent has really no applicability here." The trial court further then elaborated, "*Grimes* does say . . . duty can be created by statute . . . it seemed to me the only thing that will be applicable in this case would be some statute or reg[ulation] that would govern how a researcher is supposed to deal with their study participants." The trial court then declined to provide instructions 33-33D.

We turn briefly to the legal sufficiency of White's proposed jury instructions 33-33D under the first prong of the *Wood* analysis. Proposed instruction 33 generally explained that White was "enrolled into an FDA Drug Research Clinical Trial [g]overned in part by the Federal Food Drug and Cosmetic Act" and also subject to the legal requirements of the Baltimore City Code. Therefore, White requested that the jury be instructed that "[v]iolations of the provisions of that law which are designed to protect

-28-

people enrolled in drug studies is evidence of [n]egligence on the part of . . . KKI."
Instructions 33A-33D are taken directly from 21 CFR §§ 50.20, 50.23, 50.55, & 46.11
respectively, and pertain to the federal requirements for informed consent when an entity
solicits the participation of children in a research study. Neither party challenges that these
proposed instructions accurately reflect the federal requirements for informed consent, but
rather the dispute lies with their applicability to the facts of the underlying case. Having
determined that the requested instructions accurately reflect the federal regulations as they
pertain to informed consent, we now turn to the second prong of the *Wood* analysis.

Under the second prong of the *Wood* test, we must determine whether the proposed
instructions were required by the facts. For the following reasons, we will conclude that
proposed instructions 33-33D were not required by the facts presented in this case.

Principally, proposed instruction 33B is derived from the federal guidelines on
nontherapeutic research studies, and for the reasons discussed above, we have held, and
the parties do not seriously contest, that the TLC Study was therapeutic for all
participants.[12] The remaining instructions, 33A, 33C, and 33D, deal with the federal

_____

[12] The federal regulations, like the medical community in general, *see supra* n.9, do
not divide the world of research into therapeutic and nontherapeutic experiments as the
Court of Appeals did in *Grimes*. Instead, the federal regulations classify human research
studies based on the type of risk involved:

> 21 C.F.R. § 50.51 Clinical investigations not involving greater
> than minimal risk[.]

> Any clinical investigation within the scope . . . of this chapter
> in which no greater than minimal risk to children is presented

requirements for adequate informed consent, a question that was not presented to the jury

at trial, and that is not challenged on this appeal.[13]  As the Court of Appeals in *Grimes*

may involve children as subjects only if the I[nstitutional] R[eview] B[oard] finds that:

(a) No greater than minimal risk to children is presented; and

(b) Adequate provisions are made for soliciting the assent of the children and the permission of their parents or guardians. . .

21 C.F.R. § 50.51 Clinical investigations involving greater than minimal risk but presenting the prospect of direct benefit to individual subjects[.]

Any clinical investigation within the scope described . . . in this chapter in which more than minimal risk to children is presented by an intervention of procedure that holds out the prospect of direct benefit for the individual subject, or by a monitoring procedure that is likely to contribute to the subject's well-being, may involve children as subjects if the IRB finds that:

(a) The risk is justified by the anticipated benefit to the subjects;

(b) The relations of the anticipated benefit to the risk is at least favorable to the subjects as that presented by available alternative approaches; and

(c) Adequate provisions are made for soliciting the assent of the children and permission of their parents or guardians. . .

[13] The text of proposed instructions 33A, 33C, and 33D are as follows:

33 A.  21 C.F.R. § 50.20 General requirements for informed consent under the Food and Drug Administration[.]

distinguished, "the duty to a vulnerable research subject is independent of consent, although the obtaining of consent is one of the duties a researcher must perform." 366 Md. at 101. The only claim the White jury was asked to determine was whether KKI negligently oversaw the TLC Study. It was not asked to determine the adequacy of the informed consent. We hold that there was no abuse of discretion by the trial court in denying the

[N]o investigator may involve a human being as a subject in research unless the investigator has obtained the legally effective informed consent of the subject or the subject's legally authorized representative. An investigator shall seek such consent only under circumstances that provide the prospective subject or the representative sufficient opportunity to consider whether or not to participate. The information that is given to the subject or the representative shall be in language understandable to the subject or the representative.

33 C. 21 C.F.R. § 50.55 Requirements for permission by parents or guardians[.]

Where clinical investigations are covered by §50.53 or § 50.54 and permission is to be obtained from parents, both parents must give their permission unless one parent is deceased, unknown, incompetent, or not reasonably available, or when only one parent has legal responsibility for the care and custody of the child if consistent with State law.

33 D. 45 C.F.R. §46.116 General Requirements for Informed Consent[.]

A description of any reasonably foreseeable risks or discomforts to the subject.

requested instructions as they pertained to a federally regulated informed consent issue that was not before the jury at the time.[14]

For all these reasons, we find no error in the trial court's discretionary decision to exclude White's requested jury instructions.

### III.     Fraudulent or Negligent Misrepresentation

White's second challenge concerns whether an infant can maintain an action in tort for fraudulent or negligent misrepresentation in the absence of direct, personal reliance on the false statement.   White complains that the trial court erred in dismissing his misrepresentation claims on the grounds that White failed to demonstrate the necessary element of reliance to sustain the action.   For the reasons that follow, we uphold the judgment of the trial court, albeit on different grounds.

White alleges that KKI is liable for negligent misrepresentation (Count 40) and fraudulent misrepresentation (Count 42) by making five specific misrepresentations regarding the premises at which White resided during his participation in the TLC Study. In particular, White alleges that KKI misrepresented that: (1) the premises were "lead safe"; (2) the premises were in habitable condition; (3) the premises would be maintained in a habitable condition during White's tenancy; (4) the premises were in compliance with all applicable statutes, codes, and regulations pertaining to rental properties at the inception

---

[14] KKI also argues that this Court should deny White's appeal regarding the jury instructions because he failed to preserve the issue under Md. Rule 2-520(e).  We do not address this contention as it is moot in light of our determination that the trial court committed no error in excluding the proposed jury instructions.

of White's tenancy; and (5) that the premises were safe for White's residence. In Count 41, White also alleges that KKI negligently misrepresented the risk of harm to White from his participation in the TLC Study. Specifically, White claims that KKI knew that White's property contained lead dust hazards and that White was at risk for lead poisoning if he remained in the property, but told White's mother that there was no risk of harm from his continued participation in the TLC Study.

At the close of evidence, the trial court granted KKI's motion for judgment as to all claims of fraudulent and negligent misrepresentation. The trial court's ruling was based solely on the grounds that White failed to establish the element of reliance, which is required for both fraudulent and negligent misrepresentation claims:

> I just don't find there's any case law that's been presented to me to excuse reliance in this case. I find that no . . . reasonable jury[] could find that Mr. White, any two-and-a-half-year-old[,] could reasonably rely on any of the statements if there even were . . . the alleged misrepresentations, assuming they were made. . . . And therefore that is absolutely an element of both negligent misrepresentation and intentional misrepresentation, and for that reason, I'm granting the motion.

The trial court did note that in Maryland, a third party may successfully bring a misrepresentation action so long as the third party can demonstrate individual reliance. White's claim failed, according to the trial court, because, due to his infancy, he could not demonstrate individual reliance on any misrepresentations made to his mother.

The question before us then is whether parental reliance may be imputed to an infant in the context of misrepresentation claims. We employ a *de novo* standard of review when considering both a trial court's grant of a motion for judgment and its legal conclusions.

-33-

*Hoffman v. Stamper,* 385 Md. 1, 16 (2005). For the reasons discussed below, we will conclude that parental reliance may be imputed to an infant as a form of indirect reliance. For other reasons, however, we will hold that White is not entitled to a new trial.

### 1. Fraudulent Misrepresentation

We address fraudulent and negligent misrepresentation in turn, beginning with fraudulent misrepresentation. To prevail on a claim for fraud, a plaintiff must prove by clear and convincing evidence that "(1) the defendant made a false representation to the plaintiff, (2) the falsity of the representation was either known to the defendant or the representation was made with reckless indifference to its truth, (3) the misrepresentation was made for the purpose of defrauding the plaintiff, (4) *the plaintiff relied* on the misrepresentation and had the right to rely on it, and (5) the plaintiff suffered compensable injury as a result of the misrepresentation." *Hoffman*, 385 Md. at 29 (emphasis supplied). The key question we must address is what constitutes adequate reliance.

Reliance at its core is the action or inaction of a party that results from the misrepresentation of another. *Nails v. S & R, Inc.*, 334 Md. 398, 416-17 (1994) (holding that reliance exists if "the misrepresentation substantially induced the plaintiff to act"). Reliance can either be direct or indirect, in part depending on whether the misrepresentation was directly made to the individual seeking relief. Maryland courts have recognized that third parties can successfully bring a misrepresentation claim "even when the allegedly fraudulent statement at issue was not made to him or her directly," so long as the individual can demonstrate direct or indirect reliance on the false statement. *Exxon Mobil Corp. v. Albright*, 433 Md. 303, 335-36 (2013).

-34-

Despite the instances where recovery for fraud has been sanctioned where the allegedly fraudulent statement was not made directly to the plaintiff, we have not permitted recovery without a demonstration that the plaintiff relied, either directly or indirectly, on the relevant misrepresentation. For example, in *Diamond Point Plaza,* the defendant, Diamond Point, made a fraudulent misrepresentation to two lenders, Pinnacle and PaineWebber, "for the purpose of inducing Pinnacle and PaineWebber to extend a loan, aware that PaineWebber likely would sell the loan in the secondary market." Wells Fargo bought the loan in the secondary market. Thus, we reasoned that Diamond Point had "reason to expect that the loan documents, including [the fraudulent misrepresentation], would be presented to, would be considered by, and would influence the decision of prospective buyers in the secondary market." Therefore, not only did Pinnacle and PaineWebber, the parties to whom the actual misrepresentation was made, rely, but so too did Wells Fargo, the third party buyer in the secondary market. Although Diamond Point's representations were not made directly to Wells Fargo, Wells Fargo, as the third party, established reliance and resultant harm.

*Id*. at 366, on reconsideration in part, 433 Md. 502 (2013) (citing *Diamond Point Plaza Ltd. P'ship v. Wells Fargo Bank*, 400 Md. 718 (2007)) (internal citations omitted).

The case of *Hoffman v. Stamper* provides another helpful illustration of indirect reliance. 385 Md. 1 (2005). In *Hoffman*, plaintiffs were victims of an "elaborate flipping scheme" rife with fraudulent appraisal inflation. *Id*. at 29. Plaintiffs entered into purchase contracts for the flipped properties prior to the appraisals even being completed. *Id*. Despite that they never read the appraisals, the Court of Appeals nevertheless found that the plaintiffs indirectly relied upon them because, had they been made aware of the correct appraisal prior to closing, they might have elected to cancel the contract. *Id*. at 30. In essence, the Court of Appeals has explained in both *Exxon* and *Hoffman* that the plaintiff's

action or inaction, based on a misrepresentation that was not made directly to them, can constitute indirect reliance.

The Court of Appeals has further elaborated that a party is liable to another who indirectly relies only in circumstances where the party either intended or expected the other to act or refrain from acting as a result of the fraudulent misrepresentation. *Diamond Point Plaza Ltd. P'ship*, 400 Md. at 741-42 (finding that liability extended to Diamond Point because they had reason to expect borrowers in the secondary market would consider, and be influenced by, the fraudulent loan documents); *see also Hill v. Brush Engineered Materials, Inc.*, 383 F. Supp. 2d 814, 820-21 (D. Md. 2005) ("'Maryland law has long allowed plaintiffs to sue for injuries caused by fraudulent misrepresentations made to third parties,' so long as the plaintiff could reasonably have been expected to act or refrain from action in reliance upon the misrepresentation.") (quoting *Maryland Nat. Bank v. Resolution Trust Corp.,* 895 F.Supp. 762, 772 (D.Md. 1995)). In sum, the sufficiency of indirect reliance depends on whether the individual took action as a result of the misrepresentation, and whether the party making the false statement reasonably foresaw or intended the individual to take such action.

In this case, White's theory is that the alleged misrepresentations were made by KKI to Ms. Riddick to secure the participation of White in the TLC Study. As an infant, White's actions were governed by his parent. Ms. Riddick's decision to relocate or remain in a property naturally resulted in White staying or moving. Similarly, it was foreseeable that White's actions would be determined by his mother's decision to provide informed consent on his behalf. Indeed, this was the entire purpose of the informed consent process. If she

consented, he would participate. If she didn't, he wouldn't. We hold that Ms. Riddick's

reliance may be imputed to White, the infant, and may constitute a form of indirect reliance

by inducing White to participate in the TLC Study.[15] We further hold that the trial court

erred in determining that, as a matter of law, White was incapable of reliance solely on the

basis of his infancy.[16]

---

[15] Imputed parental reliance to an infant as a form of indirect reliance is not a novel concept, and has been taken even further in other jurisdictions. For example, a New York intermediate appellate court has held that "[f]raud [. . .] may [. . .] exist where a false representation is made to a third party, resulting in injury to the plaintiff." *Ruffing v. Union Carbide Corp.*, 764 N.Y.S.2d 462 (N.Y. App. Div. 2003) (finding that a child could maintain a fraud action against his mother's employer when the fraudulent statements caused the child harm while the child was *in utero*) (emphasis in original). The *Ruffing* court noted the "[a]pplication of the rule stated above in such a case is also consistent with precedent . . . holding that where the third person in question is an expectant mother, a tort committed against that third person may, under certain circumstances, give rise to a cause of action on behalf of the fetus who actually suffers the personal injuries. *Id.* (internal quotation marks omitted). An Illinois appellate court has also held that when minority renders an individual incapable of proving reliance, that reliance by the party responsible for the minor's care is imputed to the minor. *See Nosbaum ex rel. Harding v. Martini*, 726 N.E.2d 84, 94 (Ill. App. Ct. 2000) (noting that "[o]therwise, no infant could ever hope to avail himself of apparent agency [because] he would be incapable of his own evaluation and reliance").

[16] Although it does not form the basis of our opinion in this case, we note that if we were to adopt the Restatement (Second) of Torts treatment of instances where a fraudulent misrepresentation carries an inherent risk of physical harm, we would reach the same result:

> An actor who makes a misrepresentation is subject to liability *to another* for physical harm which results from an act done by the other *or a third person in reliance upon the truth of the representation*, if the actor
>
> (a) intends his statement to induce or should realize that it is likely to induce action by the other, *or a third person*, which involves an unreasonable risk of physical harm *to the other*, and

We do not, as KKI claims, risk extending "virtually unlimited" liability to any party making a misrepresentation by eliminating the requirement of reliance for recovery in fraud. We are, in fact, not eliminating that element at all. The concept of indirect reliance is already well established in Maryland and we do not depart from it.[17] Instead, we recognize the inherent truth that the actions of infants are often determined by the choices of their parents. Infants should not be barred from tort recovery simply because they lacked

----

> (b) knows (i) that the statement is false, or (ii) that he has not the knowledge which he professes.

Restatement (Second) of Torts § 310 (1965) (emphasis supplied). Though cited to in passing by the Court of Appeals in a small number of cases, § 310 has not been expressly adopted by Maryland courts. *But see Gourdine v. Crews*, 405 Md. 722, at 791 n.14 (2008) (recognizing that although the plaintiff attempted to make a claim under Section 310, the plaintiff failed to establish the element of duty required to sustain that claim); *see also Virginia Dare Stores v. Schuman*, 175 Md. 287, 292 (1938) (referencing § 310 when noting that "the weight of authority in other jurisdictions" allowed for tort actions based on negligent misrepresentations). Section § 310 was likewise noted by the parties in this case only in passing.

[17] It is for this reason that KKI's reliance on *Phillip Morris Inc. v. Angeletti* is unavailing. 358 Md. 689 (2000).

In *Angeletti*, the Court of Appeals reversed a class certification for plaintiffs who claimed that they should be excused from proving reliance on an individual basis for their misrepresentation-based claims. *Id*. at 689. The Court noted that the plaintiffs, who alleged harm from cigarette smoke, appeared to be advancing a theory of "per se" fraud whereby defendants' inclusion of nicotine in cigarette products, a known addictive substance, allegedly demonstrated that defendants intended to addict cigarette smokers so that smokers would continue to purchase cigarette products. *Id*. at 752 n.29. Plaintiffs asserted that evidence of personal reliance was therefore excusable under this "per se" fraud theory. *Id*. The Court denied class certification, in part, because reliance on a misrepresentation by a plaintiff, on an individual basis, is essential to a civil claim of misrepresentation. *Id*. *Angeletti* stands for the principle that a plaintiff must show reliance as an element of misrepresentation claims, but is silent on whether that individual reliance must be direct or, as here, indirect.

-38-

the capacity to form the conceptual link between the misrepresentation and their resulting action.

The objective of tort law is both to compensate victims, and deter unwanted societal behavior by increasing the cost to benefit ratio in the form of liability exposure. *Schaefer v. Miller*, 322 Md. 297, 332 (1991) (noting that the traditional purpose of civil tort law is to compensate victims who are injured, and award punitive damages in some tort cases where the defendant acted with "evil motive"); *see also* W. Page Keeton et al., *Prosser and Keeton on the Law of Torts*, 356 (5th ed.1984) ("A duty, in negligence cases, may be defined as an obligation, to which the law will give recognition and effect, to conform to a particular standard of conduct toward another." ). To allow for indirect consent of the child through the parent, and yet foreclose relief in tort to the child for lack of demonstrated reliance is logically incongruent. Parental consent is legally sufficient, and required, as the consent of the child. *See, e.g., Grimes*, 366 Md. at 93 (noting that in research studies, the consent of the child is necessarily furnished through the consent of the parent). Likewise, the action of the parent in reliance is also legally sufficient as the action of the child, who has no choice but to act in the manner prescribed by the parent. To hold otherwise would be to send the harmful message that individuals can lie to parents to ensure a particular action of the child, and face no liability in fraud so long as the child is too young to fully appreciate the speaker's words. Especially in the context of securing informed consent for an infant's participation in a potentially harmful activity, researchers face liability in fraud for misrepresentations made to parents to induce the desired action of the infant. Adopting KKI's position would promote the undesirable result of permitting a researcher, or

-39-

someone similarly situated, to lie with impunity to parents so long as it is the child that suffers the harm.

We therefore follow the law to its logical conclusion, and hold that parental reliance can be imputed to the infant as a form of indirect reliance when the misrepresentation is designed to cause actions by, or on behalf of, the infant. In doing so, we conclude that White generated a jury question about whether he demonstrated reliance by virtue of his participation in the TLC Study, which was precipitated by the alleged misrepresentations made to his mother, Ms. Riddick. However, for reasons we will discuss fully below, we hold that White is, nonetheless, not entitled to a new trial.

### 2. Negligent Misrepresentation

First, however, we turn to whether White is precluded from a successful claim of negligent misrepresentation because of a lack of personal reliance. We will conclude that the trial court erred in granting judgment in favor of KKI on the issue of reliance. The following elements are required to assert a claim for negligent misrepresentation: "(1) the defendant, owing a duty of care to the plaintiff, negligently asserts a false statement; (2) the defendant intends that his statement will be acted upon by the plaintiff; (3) the defendant has knowledge that the plaintiff will probably rely on the statement, which, if erroneous, will cause loss or injury; (4) *the plaintiff*, justifiably, takes action in reliance on the statement; and (5) the plaintiff suffers damage proximately caused by the defendant's negligence." *Lloyd v. Gen. Motors Corp.*, 397 Md. 108, 135-36 (2007) (emphasis added). For the following reasons, we will hold that the trial court's insistence that White

demonstrate direct, personal reliance is not required when the negligent misrepresentation creates a risk of physical harm as opposed to claims for pecuniary loss only.

Where a negligent misrepresentation is alleged to create a threat or risk of physical harm, Maryland courts appear to have adopted the position of Section 311 of the Restatement (Second) of Torts, which provides that:

> (1) One who negligently gives false information to another is subject to liability for physical harm caused by action taken by the other in reasonable *reliance* upon such information, where such harm results
>
>   (a) to the other, or
>
>   (b) *to such third persons as the actor should expect to be put in peril by the action taken.*

Restatement (Second) of Torts § 311 (1965) (emphasis supplied). Thus, § 311 establishes that an actor may be liable in tort to a third party who neither hears, nor directly relies on any misrepresentation by the actor. Instead, the element of reliance necessary for a negligent misrepresentation claim can be satisfied indirectly by the reliance of the "other" who acts in reliance on the misrepresentation of the actor. The commentary to § 311 of the Restatement (Second) notes that the rule applies in limited settings where physical harm is at issue and:

> [I]t is a part of the actor's business or profession to give information upon which the safety of the recipient or a third person depends . . . [and i]t extends to any person who, in the course of an activity which is in furtherance of his own interests, undertakes to give information to another, and knows or should realize that the safety of the person of others may depend upon the accuracy of the information.

*Id.* On two separate occasions the Court of Appeals of Maryland appears to have endorsed § 311's treatment of negligent misrepresentation. *Lloyd v. Gen. Motors Corp.*, 397 Md. 108, 137 (2007) (acknowledging that under § 311 economic losses constitute cognizable injury); *Village of Cross Keys v. Gypsum,* 315 Md. at 754 (noting in *dicta* the "rule" of § 311 that "negligent misrepresentation involving the risk of physical harm represents a somewhat broader liability than the rule relating to liability for pecuniary loss resulting from negligent misrepresentation"). Based on these decisions, limited though they are, we hold that § 311 has been adopted in Maryland and squarely applies to the facts of this case.[18]

Under § 311, liability attaches when an actor negligently provides false information to a party who, acting in reliance on that information, causes physical harm to a third party. As Comment B points out, it is especially applicable when it is the actor's profession to provide information "upon which the safety of a . . . third person depends." Restatement (Second) of Torts § 311 cmt. b. In essence, § 311 acknowledges a form of indirect reliance unique to negligent misrepresentations involving a risk of physical harm. That is exactly the situation presented to us now. In the context of securing White's participation in the TLC Study through the informed consent process, KKI should have expected that White was at risk of harm from any negligent misrepresentations it might have made to his

---

[18] We also note that § 311 has been widely adopted in a large number of jurisdictions. *See, e.g.,* Restatement (Second) of Torts § 311 (1965) (case citations by jurisdiction).

mother.  Therefore, under § 311, we hold that White has generated a jury question regarding

the element of reliance.[19]

Courts have adopted a different approach when the misrepresentation carries an

inherent risk of physical, rather than pecuniary harm.  The need to distinguish between

---

[19]  The cases cited by KKI are not persuasive because they do not stand for the proposition set forth by KKI, or because they are factually inapplicable to instances where the misrepresentation carries a risk of physical harm.  For example, KKI cites to *Chase v. Kawasaki Motors Corp., USA*, a federal district court case applying Alabama law, for the proposition that imputed parental reliance has been rejected in other jurisdictions.  140 F. Supp. 2d 1280 (M.D. Ala. 2001).  In *Chase*, the plaintiffs sued the retailer of their all-terrain vehicle after they were injured in an accident due to the brake failure of the vehicle. *Id*.  The plaintiffs were minors at the time that their parents purchased the vehicle, and their parents were explicitly told by a sales representative that the vehicle was safe for the plaintiffs' use.  The district court found that "the entire basis for third party standing in misrepresentation cases is that the deceiver contemplated that the third party would be induced to act by the deceiver's statements made to someone else." *Id*. at 1293.  In finding that the plaintiffs failed to establish reliance, the court noted that "[p]laintiffs, as [p]arents' children and the obvious end-users of the ATV, might appear to fit comfortably within the expanded rule" allowing third party reliance in the case of personal injury. *Id*.  The plaintiffs' failure to establish reliance was not because they could not, but because in the face of the defendant's argument that neither parents nor plaintiffs could demonstrate reasonable reliance, the plaintiffs simply chose not to respond at all. *Id*. at 1292.  Thus, *Chase* stands for the opposite proposition than that advanced for it by KKI.

KKI also asserts that indirect third party reliance has been routinely rejected by Maryland courts for both fraudulent and negligent misrepresentation.  However, with the exception of *Angeletti*, *supra* n.17, the cases cited to by KKI do not deal with misrepresentations where a risk of physical harm is involved. *See Green v. H&R Block*, 355 Md. 488 (1999) (dealing with a tax preparation company's duty to disclose its beneficial relationship with various lending institutions to which it refers customers); *Sheets v. Brethren Mut. Ins. Co.*, 342 Md. 634 (1996) (involving negligent misrepresentations of the workable condition of a septic system, but not dealing with a risk of physical harm).  As we will discuss in more detail in the following pages, courts adopt different rules depending on whether the misrepresentation involves a physical, as opposed to economic, resulting harm. While the cases cited by KKI correctly describe the element of reliance as it relates to situations where a plaintiff has suffered pecuniary harm, they fail to advance KKI's position in the present context where the harm to White is physical harm.

misrepresentations resulting in pecuniary harm, and those resulting in physical harm rests largely on the varying likelihood of the different kinds of harm. Simply put, potential exposure to pecuniary harm is broader, and therefore less foreseeable, than exposure to a specific physical harm that would result from the particular misrepresentation − thus warranting a stricter interpretation of reliance. This point is discussed by Professors Harper, James, and Gray in their treatise on tort law:

> Where misrepresentations entail the foreseeability of physical harm and such harm in fact results, the ordinary rules of negligence have for some time been applied [specifically citing § 311]. Courts have been more reluctant, however, to impose liability on this basis where a misrepresentation leads solely to economic loss. The reason for the difference is that by and large the range of physical harm is more limited. In the field of economic harm, however [i]f liability for negligence exists, a thoughtless slip or blunder . . . may expose [defendants] to a liability in an indeterminate amount for an indeterminate time to an indeterminate class.

Fowler V. Harper et al., *The Law of Torts* § 7.6 (2d ed. 1996) (internal quotations and citation marks omitted). The kind of liability set out by § 311 that recognizes that the potential range of physical harm is significantly more narrow than economic harm is "commonly stated and, presumably, widely supported." *Id*. at § 7.6 n.2. In sum, it is well recognized that when the misrepresentation results in a physical harm, and it was foreseeable that such a harm would result, a different rule is warranted, one that permits indirect reliance.

In tort law, foreseeability has always been the linchpin of liability. *Board of County Comm'rs v. Bell Atlantic-Maryland*, 346 Md. 160, 184 (1997) (noting that in tort law, "foreseeability of harm and manner of occurrence are the primary indicia of legal cause").

Our conclusion that indirect reliance may exist when the infant's actions derive from actions taken by their parents in reliance upon a misrepresentation embodies this principle. It is foreseeable when the desired outcome of the misrepresentation to a parent in an informed consent is to induce the desired participation of the infant in the study.

We conclude that requiring direct, personal reliance of the infant would constitute an unreasonable bar to the infant from recovery for tortious negligent misrepresentations made to their parents who gave informed consent on their behalf. For these reasons, the trial court erred in dismissing White's claims of negligent misrepresentation on the grounds that White failed to demonstrate reliance.

### 3. Sufficiency of Evidence

Having determined that White's infancy does not automatically preclude a claim of fraudulent or negligent misrepresentation, we now turn to KKI's alternative argument that White failed to meet his burden of proof in regard to the remaining elements of his misrepresentation claims. As the claims of fraudulent or negligent misrepresentation were dismissed by the trial court on KKI's motion for judgment, we review the sufficiency of the evidence *de novo*, and in the light most favorable to White. *Gales v. Sunoco, Inc.*, 440 Md. 358 (2014). Evidence is legally sufficient if "reasonable jurors, applying the appropriate standard of proof, could find in favor of the plaintiff on the claims presented." *Hoffman*, 385 Md. at 16. We conclude that based on the evidence before the trial court, no reasonable jury could find that KKI made a misrepresentation, either negligently or fraudulently, to Ms. Riddick. Absent this prima facie element of both torts, White's fraudulent and negligent misrepresentation claims must fail.

We hold that these claims must fail despite the fact that the trial court denied KKI's initial motion for judgment on the grounds that at that point in the trial, White had presented sufficient evidence of misrepresentation to allow the claim to go to the jury:

> [It] seems to me in a light . . . most favorable to the Plaintiff[,] there was a statement that . . . 642 Gorsuch [Avenue] was going to be lead safe. And I think this jury could infer that it was not lead-safe. And they [KKI] knew it couldn't be. . . .
>
> * * *
>
> I could find, or this jury could find that she was advised she would have lead-safe housing, and she relied on that.

As described above, the only specific finding that the trial court made when granting KKI's later, renewed motion for judgment was that White's fraudulent and negligent misrepresentation claims failed for lack of reliance. The sufficiency of the remaining elements was not revisited at that time. Thus, while we affirm the dismissal of fraudulent and negligent misrepresentation claims, we do so on different grounds than those relied on by the trial court.

We will briefly review the alleged negligent and fraudulent misrepresentations that comprise counts 40-42: (1) the premises were lead safe; (2) the premises were in habitable condition; (3) the premises would be maintained in a habitable condition during White's tenancy; (4) the premises were in compliance with all applicable statutes, codes, and regulations pertaining to rental properties at the inception of White's tenancy; (5) that the premises were safe for White's residence; and (6) the risk of harm to White from his participation in the TLC study as a result of the lead based paint hazards at the premises. Although framed differently, all of White's claims stem from KKI's alleged failure to warn

-46-

Ms. Riddick of the ongoing presence of lead in their home.  Thus, on appeal, White argues that Ms. Riddick "trusted KKI to help her find '[f]ree safe lead housing,' and expected to move to a house that was 'completely lead free' and 'lead safe.'"  We hold that Ms. Riddick's unilateral misunderstanding that the phrase "lead safe" meant that it was lead free is not tantamount to a misrepresentation by KKI.[20]

---

[20] Neither party has pointed to sources contemporaneous with the TLC Study that define the term "lead safe." Since that time, however, Maryland has codified the following definition of "lead safe" as it applies to residential housing:

> (m) "Lead-safe housing" means a rental dwelling unit that:
>
> (1) Is certified to be lead-free in accordance with § 6-804 of this subtitle;
>
> (2) Was constructed after 1978;
>
> (3) Is deemed to be lead-safe by the [State] Department [of the Environment] in accordance with criteria established by the Department by regulation; *or*
>
> (4) Is certified to be in compliance with § 6-815(a) of this subtitle and:
>
>> (i) In which all windows are either lead-free or have been treated so that all friction surfaces are lead-free;
>>
>> (ii) In which lead-contaminated dust levels are determined to be within abatement clearance levels established by the Department by regulation, within a time frame established by the Department by regulation; and
>>
>> (iii) Which is subject to ongoing maintenance and testing as specified by the Department by regulation.

-47-

Md. Code Ann., Envir. § 6-801 (2012) (emphasis supplied). Thus, according to current Maryland law, a property need not be lead free to be considered lead safe. Further, the statute clarifies that:

> [A]n owner of an affected property shall initially satisfy the risk reduction standard established under this subtitle by passing the test for lead-contaminated dust under § 6-816 of this subtitle provided that any chipping, peeling, or flaking paint has been removed or repainted on:
>
> > (1) The exterior painted surfaces of the residential building in which the rental dwelling unit is located; and
> >
> > (2) The interior painted surfaces of the rental dwelling unit.

*Id.* at § 6-815. The Code of Maryland Regulations specifies that a house may be considered "lead safe" even if it has lead-contaminated dust up to the following levels:

> (6) "Lead-contaminated dust" means dust with a lead content equal to or greater than:
>
> > (a) 40 micrograms per square foot in dust collected from a floor;
> >
> > (b) 250 micrograms per square foot in dust collected from a window sill; or
> >
> > (c) 400 micrograms per square foot in dust collected from a window well.

COMAR 26.16.02.02. The United States Department of Housing and Urban Development also uses the term "lead safe" to refer to housing that meets certain federal lead clearance standards, but not necessarily absolutely free from lead. *Clearance*, U.S. Dept. of Housing and Urban Dev., *available at* <http://perma.cc/RGD2-SMXV > (last visited Jan. 21, 2015). Thus, the term, at least now, has a clearly accepted meaning that a property need not be lead free but may contain lead dust within certain thresholds. In our view, this is consistent with what KKI represented at the time of the TLC Study.

The facts provided by White to support the aforementioned claims of misrepresentation are insufficient under the clear and convincing standard required in fraud claims, and also fail under the less stringent preponderance of the evidence standard for negligent misrepresentations. Even taken in the light most favorable to White, Ms. Riddick failed to demonstrate that KKI falsely represented to her that she and White would be provided with housing free from lead paint hazards by virtue of their participation in the TLC Study. In both the pre-enrollment consent and enrollment consent forms, KKI told parents that "[a]ll children in the TLC study will have their homes repaired and/or cleaned to get rid of lead dust and chipped paint." The pre-enrollment consent explained:

> Trained workers will come to your home to . . . find out whether your house can be cleaned or repaired *to reduce lead hazards in paint and dust*. . . .
>
> * * *
>
> If your house does not qualify at all, the person checking your home will explain why and provide further information on lead safe housing. . . .
>
> * * *
>
> If you child is eligible to continue in the study, we will then make an appointment [to vacuum and wet-wash inside the home] *to reduce as much lead dust and loose chips of paint as possible*.

(emphasis supplied). The enrollment consent included similar language

> We will look carefully at your home for lead dust and chipped paint and tell you about it. We will clean-up the lead dust in your home. . . .
>
> We believe that children in the study will get *equal or better care* than children outside the study, and that their homes

-49-

will have *less lead* in them sooner than if they were not in the study.

(Emphasis supplied). At trial, Ms. Riddick testified that Dr. Davoli explained to her that regular cleaning was necessary to assure reduced lead levels in the home, and that someone from KKI explained to her how properly clean. Ms. Riddick was also given a bucket, mop, detergent, and instructions on how to wipe down surfaces in the home daily to keep the lead dust levels low.[21] Although Ms. Riddick testified that she believed KKI was assisting her with securing completely lead free housing, she could not explain how she reconciled that understanding with her knowledge that she would have to clean daily to maintain low levels of lead dust and paint in the home. On redirect, counsel for White asked Ms. Riddick whether she had "any recollection of Dr. Davoli, or anybody from Kennedy Krieger Institute, explaining to you about the risks of lead in the environment?" Ms. Riddick replied: "Yes. Dust and lead - - I mean lead is going to come into your house anyway, but she - - you know, told me about it. And she told me to keep it clean." Based on her own testimony, Ms. Riddick understood that "lead safe" was not the same thing as "lead free." The undisputed evidence at trial demonstrates that the informed consent documents were fully explained to Ms. Riddick, including the multiple references to KKI's intention to

---

[21] At oral argument before this Court, both parties agreed that Ms. Riddick signed a document verifying her receipt of the cleaning materials although the receipt itself was not produced.

reduce, but not fully eliminate, lead contamination in the home. Thus, it is clear that KKI conveyed to Ms. Riddick that "lead safe" did not mean lead free. [22]

Similarly, providing Ms. Riddick with a list of "lead safe" housing units, even taking the evidence in the light most favorable to White, was not a misrepresentation. White alleges that Ms. Riddick chose 642 Gorsuch Avenue off the list of "lead safe" housing provided by KKI.[23] However, after Ms. Riddick moved, KKI had the property professionally cleaned and provided Ms. Riddick with cleaning materials to help keep the lead dust levels down. These actions demonstrate that KKI did not hold the property out to be lead free, and that, as we noted above, Ms. Riddick understood that she would have to clean on a regular basis to keep lead dust levels down. We can find no evidence that properties on the lead safe list were represented to TLC Study participants as lead free. In our view, no reasonable jury could find that KKI represented to Ms. Riddick that she would receive lead free housing by allowing White to participate in the TLC Study. In the absence of a misrepresentation, Counts 40-42 must fail as a matter of law. Therefore, we affirm the trial court's dismissal of White's misrepresentation claims, although as described above, for different reasons.

---

[22] Nothing in this opinion is meant to preclude a plaintiff from bringing a claim against another party for misrepresenting the term "lead safe" in light of an established standard as to what "lead safe" means. *See supra* n.20. Rather, in this case, White has claimed that lead safe was held out by KKI to mean lead free, which it does not.

[23] We note that KKI disputes providing Ms. Riddick with a list of lead safe housing. The social worker who allegedly provided the list was not associated with the TLC Study, and testified at trial that she never provided Ms. Riddick with a list. We need not resolve this dispute.

## IV.   The Maryland Consumer Protection Act

The final issue presented for our review is whether a party may be liable under the Maryland Consumer Protection Act for misrepresentations made to a consumer in the absence of a direct consumer transaction between the parties.  As we discuss in more detail below, Maryland law extends potential liability under the CPA to a party who is not the direct seller when that party plays an "integral role" in the transaction and the misrepresentation sufficiently "infects" the sale or offer for sale.  Nevertheless, in light of the facts presented to the trial court, we affirm the trial court's dismissal of White's CPA claim. [24]

---

[24] KKI argues that the White's theory that KKI was sufficiently integral to the lease transaction to bring KKI within the scope of the CPA was not preserved for our review because White did not adequately present it to the trial judge.  We disagree.   Regarding the preservation of issues for appellate review, "[o]rdinarily, the appellate court will not decide any other issue unless it plainly appears by the record to have been raised in or decided by the trial court." Md. Rule 8-131.  We conclude that although White now frames his argument in more specific terminology, the essence of his contention is the same as it was before the trial court and therefore sufficiently preserved.  Before the trial judge, White argued that KKI was liable under the CPA because it was "involved with the rental" by virtue of "provid[ing] a list of properties that they held out to be lead-safe, which were not [safe]… [and] represent[ing] that the property in question had a character or quality, which it did not have for the purposes of the lease."  When questioned by the trial court about whether there needed to be a direct commercial transaction to trigger liability under the CPA, White's attorney responded:

> [Ms. Riddick] relies on what they say.  She signs the lease with the landlord.  That's the transaction.  But they [KKI] don't have to be the owner, they don't have to be the landlord.  They don't even have to be the operator in order for there to be a CPA violation.  All they have to do is promote this, or advertise it, or to represent that the property or the service has a quality that it does not have.  And that's essentially what – all we've alleged.

-52-

In Count 44 of the original complaint, White alleged that KKI violated the CPA by holding out certain properties as "lead safe," yet "failing to properly repair and abate the property before [White] moved in" despite allegedly assuring Ms. Riddick that the property "would be lead safe upon their taking possession." At the close of evidence, KKI moved for judgment as a matter of law as to this count arguing that the CPA did not apply to KKI's actions because (1) KKI was not an owner or operator of the subject properties; (2) there was no evidence of a commercial transaction between KKI and White; and (3) KKI had no financial interest in the properties. White countered that KKI's liability under the CPA resulted from their "represent[ation] that the property in question had a character of quality, which it did not have for the purposes of the lease." The trial court expressed concern over the lack of a commercial transaction between the parties at several points in the motions hearing:

> THE COURT: Do you have any case . . . in which someone, who was either not somehow affiliated with the landlord, or worked for the landlord, was an agent with the landlord, . . . someone outside the landlord that fell under the Consumer Protection Act?
>
> * * *
>
> [APPELLANT'S COUNSEL]: There's no requirement to a commercial transaction under this Code section. It doesn't say anywhere that you have to consummate a transaction . . .

---

The argument presented by White on appeal appears to be a more sophisticated legal argument, but rests on the same legal foundation offered at trial: that KKI's involvement brought it within the scope of the CPA despite the lack of a direct consumer transaction between KKI and Appellants. We hold that White sufficiently preserved his claim that KKI was integral to the lease transaction.

> THE COURT: No. And I don't think that's it; but there has to
> be a transaction.

In granting KKI's motion as to Count 44, the trial court did not further elaborate on its reasoning other than to say "[m]aybe the Court of Special Appeals will deal with this relatively interesting issue."

We review the trial court's application of Maryland law *de novo*, and hold that the trial court erred in requiring proof of a direct consumer transaction between White and KKI for liability to attach under the CPA. *See Baltimore Cnty. v. Aecom Servs., Inc.*, 200 Md. App. 380, 397 (2011) (citing *Powell v. Breslin,* 195 Md.App. 340 (2010)).

The CPA was enacted by the General Assembly for the purpose of providing "strong protective and preventive steps to investigate unlawful consumer practices, to assist the public in obtaining relief from these practices, and to prevent these practices from occurring in Maryland." Md. Com. Law ("CL") Ann. Code § 13-102(b)(3). The CPA prohibits an individual from engaging in:

> [A]ny unfair or deceptive trade practice, as defined in this subtitle or as further defined by the Division, in:
>
> (1) The sale, lease, rental, loan, or bailment of any consumer goods, consumer realty, or consumer services;
>
> (2) The offer for sale, lease, rental, loan, or bailment of consumer goods, consumer realty, or consumer services.

CL § 13-303. An unfair or deceptive trade practice is defined in relevant part as a "[f]alse . . . or misleading . . . representation of any kind which has the capacity, tendency, or effect of deceiving or misleading consumers," including a representation that "[c]onsumer goods, consumer realty, or consumer services have a characteristic . . . or quantity which they do

-54-

not have." CL § 13-301(1)-(2)(i). "The gravamen of an 'unfair or deceptive trade practice' under the Consumer Protection Act is whether the false or misleading statements or representations have 'the capacity, tendency, or effect of deceiving or misleading consumers." *MRA Prop. Mgmt., Inc. v. Armstrong*, 426 Md. 83, 110-11 (2012), (quoting the CPA) (internal citations omitted). The CPA squarely applies to leases and is designed in part "to protect consumers from unfair or deceptive trade practices that induce[] prospective tenants to enter into a lease." *Butler v. S & S P'ship*, 435 Md. 635, 666 (2013) (internal citations omitted).

The Court of Appeals has held that "in limited circumstances, liability under the Consumer Protection Act may extend to one who is not the direct seller." *MRA Prop. Mgmt., Inc.*, 426 Md. at 109 (quoting *Hoffman*, 385 Md. at 32); *Morris v. Osmose Wood Preserving*, 340 Md. 519, 541 (1995) ("It is quite possible that a deceptive trade practice committed by someone who is not the seller would so infect the sale or offer for sale to a consumer that the law would deem the practice to have been committed 'in' the sale or offer for sale.") (internal quotations omitted). Liability has only been extended to third parties under the CPA in limited instances where the third party's actions were so integral that the sale of consumer goods would not have proceeded without their involvement. *Hoffman*, 385 Md. at 32, (finding that misleading appraisals directly infected the sale of property because the sale would not have proceeding to closing absent the appraisals); *MRA Prop. Mgmt., Inc.* 426 Md. at 109 (finding that a statutory obligation to provide materials to prospective buyers injected MRA and the Association into the sales transaction as central participants because a failure to provide the materials would have rendered the sale

-55-

unenforceable). We hold that a third party's conduct may so infect a consumer transaction to expose that party to liability even where there is no direct commercial transaction between the third party and the consumer. Therefore, if the party making the misrepresentation to the consumer is not the direct seller, the fact-finder must determine whether the misrepresentation was sufficiently integral to infect the sale or lease of consumer goods.

We hold that the trial court erred to the extent that it required White to show a direct consumer transaction between White and KKI for liability to attach under the CPA. Instead, the proper inquiry is whether KKI's actions regarding the leased properties were sufficiently integral to "so infect the sale or offer for sale" that a claim of consumer fraud under the CPA can survive a motion for judgment. *Hoffman*, 385 Md. at 32. Whether a party's involvement is sufficiently integral to a sale of consumer goods to bring it within the purview of the CPA is a determination based on the specific factual circumstances of each case.

Our holding reflects the prior holdings of the Court of Appeals, as well as the underlying purpose of the CPA to provide a broad remedy for consumers who are fraudulently induced into sale or lease transactions. CL § 13-102(b)(3). As was the situation in *Hoffman*, discussed *supra* at III.1, with the fraudulent appraisal scheme, circumstances may exist where the misrepresentations of a third party are a necessary component in a larger conspiracy to induce a consumer to buy or lease consumer goods. Such fraudulent practices fall squarely within the scope of behavior the CPA was designed to prohibit.

Additionally, applicability of the CPA to one who is not the direct seller does not risk overextension of liability in light of the clear limitations articulated by the Court of Appeals. We highlight that liability has only extended to a third party when the third party's misrepresentation was a necessary component in the sale or lease. In other words, it must be the case that the consumer transaction would not have proceeded absent the third party's misrepresentation. *See MRA Prop. Mgmt., Inc.,* 426 Md. at 109. As stated by the Court of Appeals, and echoed now by this Court, extension of liability under these limited circumstances is both warranted and necessary.

Having determined the legal standard for liability under the CPA, we now apply it to the case at hand to determine whether White introduced sufficient facts at the time of the motion for judgment to allow for the CPA claim to proceed to the jury. We will hold that White failed to demonstrate that KKI engaged in an unfair or deceptive trade practice, therefore we affirm the dismissal of his CPA claim.

White alleges that KKI engaged in a deceptive trade practice by representing to Ms. Riddick that certain properties were "lead safe," thus inducing her to enter into lease agreements. For the reasons we discussed at length above in Section III regarding Fraudulent and Negligent Misrepresentation, we hold that no reasonable jury could have found that KKI misrepresented to Ms. Riddick that "lead safe" meant that the property was completely free from lead hazards, and would remain free from lead hazards. Rather, KKI accurately described the presence of lead in the home. We, therefore, affirm the trial court and conclude that White's CPA claim was properly dismissed.

## CONCLUSION

For the foregoing reasons, we affirm the judgments of the trial court.

**JUDGMENTS OF THE CIRCUIT COURT FOR BALTIMORE CITY AFFIRMED. COSTS TO BE PAID BY APPELLANT.**